ABNER L. DUNCAN'S HEIRS AND REPRESENTATIVES, PLAIN-
TIFFS IN ERROR v. THE UNITED STATES.

Action on a bond executed by William Carson, as paymaster, and signed by
A. L. Duncan and John Carson as his sureties, conditioned that William
Carson, paymaster for the United States, should perform the duties of
that office within the district of Orleans. The breach alleged was that
W. C. had received large sums of money in his official capacity, in his
life time, which he had refused to pay into the treasury of the United
States.

The bond was drawn in the names of Abner L. Duncan, John Carson and
Thomas Duncan as sureties for William Carson, but was not executed by
Thomas Duncan. There were no witnesses to the bond, but it was
acknowledged by all the parties to it before a notary public. The de-
fendants, the heirs and representatives of A. L. Duncan, in answer to
a petition to compel the payment of the bond, say that it was stipulated
and understood, when the bond was executed, that one Thomas Duncan
should sign it, which was never done, and the bond was never completed;
and therefore A. L. Duncan was never bound by it : they also say, that,
as the representatives of A. L. Duncan, they are not liable for the alleged
defalcation of William Carson, because he acted as paymaster out of the
limits of the district of Louisiana; and the deficiencies, if any, occurred
without the limits of the said district.

Before the jury were sworn the defendants offered a statement to the court
for the purpose of obtaining a special verdict on the facts, according to
the provisions of the act of the legislature of Louisiana of 1818. The
court would not suffer the same to be given to the jury for a special
finding, because it "was contrary to the practice of the court to compel
a jury to find a special verdict."

The judge charged the jury that the bond sued upon was not to be gov-
erned by the laws of Louisiana in force when the bond was signed at
New Orleans, but that this and all similar bonds must be considered as
having been executed at the seat of the government of the United States,
and to be governed by the principles of the common law ; that although
the copy of the bond sued on, which was certified from the treasury
department, exhibited a scrawl instead of a seal, yet they had a right to
presume that the original bond had been executed according to law ; and
that in the absence of all proof as to the limits of the district of New
Orleans, the jury was bound to presume that the defalcation occurred
within the district; and if the paymaster acted beyond the limits of the
district, it was incumbent on the defendants to prove the fact : held, that
there was no error in these decisions of the district court of Louisiana.

This is an official bond, and was given in pursuance of a law of the United
States. By this law, the conditions of the bond were fixed ; and also the

manner in which its obligations should be enforced. It was delivered to the treasury department at Washington; and to the treasury, did the paymaster and his sureties become bound to pay any moneys in his hands. These powers exercised by the federal government cannot be questioned. It has the power of prescribing under its own laws, what kind of security shall be given by its agents for a faithful discharge of their public duties. And in such cases the local law cannot affect the contract, as it is made with the government; and, in contemplation of law, at the place where its principal powers are exercised.

It is not essential that any court, in establishing or changing its practice, should do so by the adoption of written rules. Its practice may be established by a uniform mode of proceeding for a series of years, and this forms the law of the court. In this case it appears that the Louisiana law, which regulated the practice of the district court of Louisiana, has not only been repealed, but the record shows that in the year 1830, when the decision was given in this case, there was no such practice of the court, as was adopted by the act of congress of 26 May 1824. The court refused the statement of facts to go to the jury for a special finding, because they say "such was contrary to the practice of the court."

By the court. On a question of practice, it would seem that the decision of the d'strict court as to what the practice is should be conclusive. The pra .tice of the court cannot be better known and established than by its own solemn adjudications on the subject.

IN error from the district court of the United States for the eastern district of Louisiana.

On the 22d November 1829, the district attorney of the United States filed, on behalf of the United States, a petition stating that on the 4th of March 1807, William Carson, Abner L. Duncan and John Carson made and executed their bond to the United States in the sum of ten thousand dollars, by which they bound themselves and each of them, and either of their heirs, executors and administrators, that William Carson, paymaster of the United States, should well and truly perform and discharge, according to law, the duties of the office of paymaster of the United States, within the district of New Orleans.

The petition alleged a breach of this bond by William Carson, paymaster, in having received in his life time large sums of money in that capacity, which he refused to pay into the treasury of the United States. And also that Abner L. Duncan has deceased, leaving property, and that, by reason of the facts above stated, his heirs, to wit, John N. Duncan, Frances

Duncan, wife of Frederic Conrad, Hannah Duncan, Eliza Duncan, and Abner Duncan, all children of the said Abner L. Duncan, these three last named being minors, and also Frances S. Duncan, wife of the said Abner L. Duncan, who has accepted the community of her deceased husband, have become liable to pay, and are indebted to the United States, jointly and severally, in the sum of ten thousand dollars. The petition proceeds to pray that John N. Duncan and Frances S. Duncan, and the aforesaid minors Hannah, Eliza, and Abner Duncan, their tutors and curators, be cited to answer the petition, and that, after due proceedings had, they may have judgment against them, jointly and severally, for the sum of ten thousand dollars, with interest and costs.

To this petition was annexed a copy of the bond, as follows :

" Know all men by these presents, that we, William Carson, paymaster for the United States of America, within the district of New Orleans, Abner L. Duncan, John Carson, and Thomas Duncan, Esquires, are held and firmly bound unto the said United States in the penal sum of ten thousand dollars, money of the United States, to be paid to the said United States of America, for which payment well and truly to be made we bind ourselves, and each of us, by himself, our and either of our heirs, executors, and administrators, firmly by these presents. Sealed with our seals, and dated this fourth day of March one thousand eight hundred and seven.

" The condition of this obligation is such, that if the above bounden William Carson, paymaster for the United States of America, do and shall well and truly, according to law, perform and discharge the duties of said office of paymaster for the United States of America within the district of Orleans, then the above obligation to be null and void, otherwise to remain in full force and virtue.

WILLIAM CARSON, [SCRAWL].

A. L. DUNCAN, [SCRAWL].

JOHN CARSON, [SCRAWL]."

The bond was acknowledged by William Carson and Abner L. Duncan, before a notary public in New Orleans, on the 4th day of March 1807, and by John Carson, before a notary

public at Harrisburg, Pennsylvania, on the 21st day of May 1807. The copy of the bond was certified according to the provisions of the act of congress of 3d of March 1817, entitled "an act providing for the prompt settlement of accounts."

To the petition of the United States, the heirs and representatives of Abner L. Duncan, filed an answer on the 14th day of December 1829, in which all the allegations in the petition were denied, except that Abner L. Duncan did sign the bond therein referred to; but they aver that said Duncan was not, in his life time, nor are the respondents, bound in law to pay the amount thereof, nor any part thereof.

They further aver, that by and in said bond, it was stipulated and understood (when the same was signed by the said Abner L. Duncan, as security for said Carson), that one Thomas Duncan should also sign the same, as his co-surety, but that the said Thomas Duncan never did sign the same, and said bond never was completed, nor was said Abner L. Duncan ever bound thereby.

Afterwards, on the 26th of May 1830, an amended answer was filed, stating that the respondents are not liable for the alleged defalcation in the accounts of said Carson, because said Carson acted as paymaster out of the limits of the district of Louisiana, and the said deficiencies, if any exist, occurred without the limits of said district.

The cause came on for trial upon these pleadings on the 29th day of May 1830; and before the jury were sworn, the counsel for the defendants offered to the court, a statement of the facts, for the purpose of obtaining a special verdict on the facts, under the tenth section of the act of the legislature of the state of Louisiana of 1817, page 32. This being opposed by the district attorney, the court refused to admit the same, or to suffer the same to be given to the jury for a special finding, "because such was contrary to the practice of this court; and because a jury ought not to be compelled to find a special verdict." Whereupon, the counsel for the defendants excepted to the opinion and decision of the court therein, before the jury were sworn.

On the trial of the cause, a transcript from the treasury department of the accounts of William Carson as paymaster,

was giv n in evidence, showing a balance due to the United States, of six thousand one hundred and twenty-six dollars eleven cents, for which sum a verdict was given, and a judgment thereon rendered in favour of the United States.

On the trial the defendants took the following bill of exceptions.

"Be it remembered, that, on the trial of this cause, the judge charged the jury that the bond sued on was not to be governed by the laws of Louisiana, or those in force in the territory of Orleans at the time said bond was signed by Abner L. Duncan, who signed it in New Orleans in the then said territory; but that this, and all similar bonds, must be considered as having been executed at the seat of government of the United States, and to be governed by the principles of a common law, to wit, the common law of England.

"The judge further charged the jury that, although the copy of the bond sued on exhibited a scrawl instead of a seal, yet they had a right to presume that the original bond had been executed according to law, to wit, that it was sealed in the manner prescribed by the common law; that the scrawl in the copy represented the place of the seal as plainly as could be done without a fac simile; and that if the fact was otherwise, it was in the power of the defendants to have shown it.

" The judge also charged the jury that they were bound to presume, in the absence of all proof as to the limits of the district of Orleans, that the deficiency in the accounts of Carson (hereunto annexed), the principal obligor on said bond, occurred on account of moneys received and disbursed as paymaster of the district of Orleans, although it was proved that said Carson had acted as paymaster, and disbursed moneys, as such, at fort Stoddart, and at the town of Washington, both in the then territory of Mississippi, and finally, that if said Carson disbursed money in any other district than that of Orleans, it was incumbent on the defendants to prove that fact. The judge further charged that the possession of the bond by the treasury department, was prima facie evidence of delivery. To all of which charges, the counsel for the defendants then and there excepted, before the jury retired to consider their verdict."

[Duncan v: The United States.]

The defendants prosecuted a writ of error to this court : and the record presented the bills of exceptions to the ruling of the district court, as to the claim to have a special verdict ; and the matters which the defendants' counsel offered for the jury to find as such ; and also the bill of exceptions sealed by the court on the trial of the cause.

The case came on for argument at the January term of this court in 1832, and was held under advisement. It was in part reargued at this term.

Mr C. J. Ingersoll, for the plaintiffs in error, contended:

1. It was an error in the court below to reject the practice of the state and substitute the common law of England. The practice of the state was established by the act of 1817, adopted and made the law of the court of the United States by the act of congress of the 26th of May 1824. 3 Laws U. S. by Story, 1791. The case of Parsons v. Bedford, 3 Peters, 445, settles the principle. The cases of Parsons v. Armor, 3 Peters, 413, and Parsons v. Bedford, before cited, settle every thing but the mere application of their principles to any given circumstance; and it is clear that the district court of Louisiana has established no practice of its own; which, if so, must appear judicially and declaratorily. It is true that the act of Louisiana of 1817 was repealed by the act of 1825, establishing a different code of practice. Which practice then is to prevail? that of 1817 or that of 1825? Certainly the former, because that was sanctioned by the act of congress of 1824; and when state practice is once adopted by a federal court, it never fluctuates according to the practice or legislation of the state, but remains fixed, till changed by the rule of the federal court, or by act of congress. It is the same case in principle as that of the old states under the judiciary act of 1789: they took the state practice, as existing then, and have never followed any state change since. Wayman v. Southard, 10 Wheat. 1. The power of regulating process in the federal courts is exclusively federal: it abides in congress, until by them delegated, as far as necessary, to the federal courts. The second section of the act of congress of the 8th of May 1792, 1 Story's Laws U. S. 257, enacts that the modes of proceeding shall be the same as

[Duncan v. The United States.]

were then used pursuant to the act of 1789. Infinite confusion would ensue, and the supreme power would be subverted, if the states were allowed to alter the practice of the federal courts. The case of Fullerton v. The Bank of the United States, 1 Peters, 604, shows how the federal court for Ohio, admitted into the union in 1802, adopted the state practice. So the federal court of Louisiana might adopt the state practice; but not having done so expressly, or by affirmative regulation, the practice first used, that of 1817, became its permanent practice, and could not be affected by the state code of practice of 1825. For this is not a question of right, falling under the decision of Cox v. The United States, 6 Peters, 203; but a question of remedy. The common law does not apply, but the law of Louisiana, which is the place of suit; and as was ruled by Judge Washington, state laws qualify rights, but have no influence on remedies in the federal courts. Campbell v. Claudius, 1 Wash. C. C. Rep. 485. The only question is, which of the remedies is the proper one: and it is submitted that the state practice, first sanctioned by act of congress, and applied in the federal court, remains the practice of that court till changed by its own regulation, or act of congress.

2. Duncan's heirs are not liable, because it is not his bond, as they pleaded. The body of the bond proves that Thomas Duncan was, by the contract, to share its responsibility with Abner Duncan, and without the signature of Thomas it never was completed or delivered, but remains an escrow. It may be good against Carson, but not against Duncan. The very point has been adjudged in the supreme court of Louisiana, in the case of Wells v. Dill, 1 Martin's Rep. N. S. 592. Pothier, as there cited, shows this to be a principle of law. It is a question of contract, how far the surety's liability extends. Craythorne v. Swinburn, 14 Ves. 166. The case of Leaf v. Gibbs, 4 Car. & Pay. 466, 19 English Common Law Reports, 475, is a case at common law, precisely in point. And the case of Pawling v. The United States, 4 Cranch, 219, is an analogous adjudication, which rules the principle, if not the very point. The bond is not joint and several, but a joint obligation: "we bind ourselves and each of us by these presents:" and the principle of joint liability is among the rudiments of the

VoL. VII.—3 F

[Duncan v. The United States.]

common law, from the very commencement of the contract to execution upon it by final process. Judgment against three, will not bear execution against any one of them. Clerk v. Clement, Roll. Ab. 888; 6 Term Rep. 525. Judgment against two defendants will not even bear ca. sa. against one, and elegit against another. Blumfield v. Roswith, Cooke's Eliz. 573; 5 Co. 86; Whitaker v. Hankinson, Cro. Car. 73; Barton v. Pettit, 7 Cranch, 288, 2 Cond. Rep. 494.

3. Duncan's heirs are not answerable, because he became surety, at all events, for no more than the district of Orleans; and Carson's delinquency, if any, occurred beyond that district. The bond is explicitly confined in terms to the district of Orleans. Carson's appointment as paymaster was regulated by the act of congress of the 14th of March 1802, by the third section of which, each paymaster is allotted to a localized district, and by the sixteenth section the paymaster-general, who is to appoint the paymasters, and require them to give bond with surety, is to appropriate each one to a defined district. 3 Story's Laws U. S. 451. It is well settled that suretyship for one place, does not cover delinquencies in another. Miller v. Stewart, 9 Wheat. 630; United States v. Kirkpatrick, 9 Wheat. 720. Now the account in proof is unlimited; it is against Carson as paymaster, without designating any district. The only credit is for a sum recovered of Carson's administrator in Mississippi. The charge is, that although it was proved that Carson disbursed as paymaster in Mississippi, yet in the absence of all proof as to the limits of the district of Orleans, the jury must presume that the deficiency occurred in that district, which takes for granted that Carson did disburse as paymaster in Mississippi. Thus all districts are confounded, without regard to the act of congress, or the bond in this case, and the surety is made to answer for every district in the union.

Mr Taney, attorney-general, admitted,

That by the act of congress of 1824, the courts of the United States in the district of Louisiana, were authorized to modify the practice of those courts, and to arrange the same differently from the practice in the state courts, if the same should be deemed proper. In 1824, the law of Louisiana of 1817, au-

thorizing a special finding by a jury, was in force: but in 1825, " The Code of Practice" of the courts of Louisiana was adopted and promulgated, by which the right of a party to insist on a special verdict was taken away, and the proceedings in jury trials were left to the rules of the common law.

It was in the exercise of the powers granted to the judges of the courts of the United States by the act of 1824, that the practice of adopting the rules of the common law in jury trials was adopted by the court; and that the practice of a special finding did not prevail, is sufficiently shown by the court saying that the mode of proceeding demanded "was contrary to the practice in the district court of the United States." The declaration of the judge of the district court is evidence of the rule; as it is not required that the rule should have been in writing.

To maintain the exception taken by the counsel for the plaintiffs in error, it should be shown that by the act of congress it was the duty of the courts of the United States to adopt the practice of the state courts, as it stood at the passage of that law. If they had the power to reject any part of it; or if they had the power to change the practice, as it might be changed in the state courts, the exception fails. Both these powers must be denied to have existed in the court, in order to render the refusal of the district judge error.

As the act of 1824 is in substance and effect the same with the act of May 8th, 1792, the interpretation given of the latter act will assist in the construction of the former law.

It has been decided that under the act of 1792, the powers of the courts of the United States could be exercised to change the modes of proceeding and establish them according to the rules these courts might adopt. Bank U. S. v. Halstead 10 Wheat. 51, 60, 61.

The language of the act of 1824, is different from that of 1792, inasmuch as in reference to the adoption of the state practice, the words "now used," are omitted ; thus showing that it was the intention of the legislature to authorize a change of the practice in the courts of the United States, as changes might be made in the state courts, should the judges of these courts approve of the same. The new code of practice was

about to be adopted; and as it was regarded as an improvement, the courts of the United States were left at liberty to adopt it with such modifications as they thought proper. It was in the power of the district court to adopt the practice established by that code, and it has adopted it. Cited 3 Peters, 443, 1 Cond. Rep. 141.

If the act of 1824 required that the courts of the United States should adopt the practice of the courts of Louisiana as *then* established, the law would have been unconstitutional. The law of Louisiana of 1817, as it took away the right of trial by jury, was void. The right of the jury to give a general verdict is an essential and most important ingredient in the trial by jury; it is as much a part of the law of the trial by jury, as their number and unanimity; and a court is bound to receive a general verdict if the jury offer to find generally. The right to trial by jury, as the same is used and exercised at common law, is secured to every citizen of the United States by the constitution, both in civil and criminal cases. Amendments to the Constitution, art. 5, 6 ; 2 Dallas, 309.

But if congress had the power to legislate on this subject, and it is not denied that such right existed, they have, by the act of 1789, directed the mode of trial by jury in the district and circuit courts ; and when by that act that mode of trial is directed, the powers and principles which belong to it at common law are given.

It was to prevent any discrepancy between the constitution and laws of the United States, and the law and practice of Louisiana, that the power to modify this practice was given to the court, and that power has been employed. 3 Peters, 425, 445.

As to the position assumed by the counsel for the plaintiffs in error, that the law of Louisiana is different from the common law as to the liabilities of sureties in a bond and the remedies against them; the decision of this court in the case of Cox and Dick v. The United States, 6 Peters, 171, has settled the law of the contract to be against the plaintiffs. The contract entered into by those who executed this bond, is governed by the law of the district of Columbia, in which, at the treasury department, the paymaster was bound to account.

[Duncan v. The United States.]

In reference to the objection taken to the copy of the bond having a scrawl in place of a seal, it was argued that had the original instrument been executed in that form, it would have been sufficient. 1 Stark. Ev. 333, note 1. But this inquiry is rendered unimportant, as the certificate from the treasury department fully authenticates the copy.

There is no evidence that William Carson was the paymaster of any other district than the district of Orleans; nor what were the limits of that district. The military pay districts were not regulated by any particular territorial divisions, but were assigned by the president. Act of congress of March 16, 1802.

The only appointment held by William Carson, was that mentioned in the bond, and under that appointment the money was advanced to him; and if his payments were rightfully made they were made within his district; if out of it and made wrongfully, his sureties are answerable for the mis-appropriation. If the principal in the bond had any other appointment, it was the duty of the defendants in the court below to have shown the same.

The possession of the bond by the proper officers of the government of the United States is sufficient, in the absence of contrary proof of the delivery of the bond. Had it been held as an escrow, until Thomas Duncan had executed it, this should have been made out by evidence. Bank U. S. v. Dandridge, 12 Wheat. 64; Union Bank v. Ridgely, 1 Har. and Gill, 430.

Mr Justice M'LEAN delivered the opinion of the Court.

This writ of error is prosecuted to reverse a judgment of the district court, which exercises circuit court powers, in the state of Louisiana.

In the year 1829 an action was commenced by the United States against the plaintiffs in error, on a bond given by William Carson, as paymaster, and signed by A. L. Duncan and John Carson as his sureties. The bond bears date the 4th day of March 1807, and contains a condition "that, if the above bounden William Carson, paymaster for the United States of America, do and shall well and truly, according to law, perform

and discharge the duties of said office of paymaster, &c. within the district of Orleans, then the obligation to be void," &c.

The breach alleged in the petition was, that William Carson, paymaster, &c., "has not well and truly, according to law, discharged and performed the duties of said office for the district of Orleans; but that, on the contrary, he did, in his life time, receive large sums of money in his capacity aforesaid, which, although frequently requested, he refused to pay into the treasury of the United States."

The defendants in their answer say, that "by, and in said bond, it was stipulated and understood, when the same was signed by Abner L. Duncan, as security for said Carson, that one Thomas Duncan should also sign the same, as his co-surety, but that the said Thomas Duncan never did sign the same, and said bond never was completed, nor was said A. L. Duncan ever bound thereby." They also aver that they are not liable for the alleged defalcation in the accounts of said Carson, because he acted as paymaster out of the limits of the district of Louisiana, and the said deficiencies, if any exist, occurred without the limits of said district.

Before the jury were sworn, the defendants offered a statement to the court, for the purpose of obtaining a special verdict on the facts, in pursuance of the provisions of the tenth section of a statute of Louisiana, passed in 1817. But the court overruled the statement, and would not suffer the same to be given to the jury, for a special finding, because it was contrary to the practice of the court to compel a jury to find a special verdict. To this decision an exception was taken.

A transcript of the accounts of Carson, duly certified by the treasury department, was then given in evidence to the jury; and the judge charged the jury, that the bond sued on was not to be governed by the laws of Louisiana, or those in force in the territory of Orleans, at the time said bond was signed by A. L. Duncan, who signed it in New Orleans, in the then said territory; but that this, and all similar bonds, must be considered as having been executed at the seat of government of the United States, and to be governed by the principles of the common law. That although the copy of the bond sued on exhibited a scrawl instead of a seal, yet they had a right to

presume that the original bond had been executed according to law. That the jury were bound to presume, in the absence of all proof as to the limits of the district of Orleans, that the defalcation of Carson occurred in the district of Orleans, although it was proved that he disbursed moneys, as paymaster, at fort Stoddart and at Washington, in the territory of Mississippi; and that if the defendant Carson had acted as paymaster beyond the limits of the district of Orleans, it was incumbent on the defendants to prove the fact. And the judge also charged the jury, that the possession of the bond by the treasury department was prima facie evidence of delivery—to which charge exceptions were taken.

The jury rendered a verdict against the defendants, for six thousand one hundred and twenty-six dollars, with interest, &c.

This judgment the plaintiffs in error pray may be reversed, on the following grounds:

1. Because the surety, Abner L. Duncan, is not bound; as when he executed the bond, it was agreed that it should also be signed by Thomas Duncan.

2. Because William Carson was appointed paymaster for a certain district, and the judgment covers defalcations, which may have occurred out of such district.

3. The rejection by the court of the statement of facts, on which a special verdict was prayed.

4. Because the rejection of this statement precluded the defendants from proving that the bond was delivered as an escrow.

As to the first error assigned, it appears, on an inspection of the bond, it was drawn in the names of Abner L. Duncan, John Carson, and Thomas Duncan, as sureties for William Carson, but that Thomas Duncan never signed it. There are no witnesses to the bond, but, on the day of its date, it was acknowledged by William Carson and Abner L. Duncan, before a notary public at New Orleans, and on the 21st day of May following, John Carson acknowledged it before a notary public at Harrisburgh, in Pennsylvania.

To sustain this ground, reference is made to a decision of the supreme court of Louisiana in the case of Wells v. Dill, reported in 1 Martin, 592. In their decision, the court say, that,

"the defendant is sued on the ground that he signed as surety, an instrument, purporting to be a bond, signed by Charles Blanchard, for his faithful performance of the duties of curator, to the vacant estate of one Jared Risdon, deceased. In opposition to this action, the defendant relies, principally, on the want of the signature of another person to the instrument, whose name is mentioned in the body of it as co-surety. The bond is drawn in the name of Charles R. Blanchard, as principal, and the defendant and Walter Turnbull as sureties. At the bottom, the names of Blanchard and Dill are affixed; that of Turnbull is wanting. We agree with the defendant, that, under these circumstances, his signature to the obligation does not bind him. The contract is incomplete, until all the parties contemplated to join in its execution affix their names to it, and while in this state cannot be enforced against any one of them. The law presumes that the party signing did so, upon the condition that the other obligors named in the instrument should sign it: and their failure to comply with their agreement gives him a right to retract." Pothier is cited by the court to sustain this principle.

There can be no doubt, that under the civil law, the principle is correctly stated by the court. It must be observed, however, that the court say, the want of Turnbull's signature was principally relied on to invalidate the bond; so that there seems to have been no circumstances going to refute the presumption against its validity, arising from its face; and that the omission of the signature, was not the only ground of objection to it.

It is a principle of the common law, too well settled to be controverted, that where an instrument is delivered as an escrow, or where one surety has signed it on condition that it shall be signed by another before its delivery, no obligation is incurred until the condition shall happen. And if it appeared in the present case, that Abner L. Duncan signed the bond, to be delivered on condition that Thomas Duncan should execute it, there can be no doubt the plea should have been sustained in the court below. But the delivery of the bond, as well as the signatures of the parties, is a question of fact for the jury; and this court cannot determine the legal question arising on

such fact, unless it be stated in a bill of exceptions. The acknowledgement of the bond by Abner L. Duncan, and afterwards by John Carson, unconditionally, and its delivery to the government, would seem to rebut the inference drawn by the plaintiffs against its validity, from the simple fact of its not having been signed by Thomas Duncan. There is, therefore, nothing upon the face of the record which would go to destroy the validity of this bond.

A question was raised, and elaborately argued by the counsel for the plaintiffs, whether this bond, having been executed at New Orleans, was not governed, not only as to the manner of its execution, but also as to the extent of the obligations incurred under it, by the principles of the civil law. In the case of Cox et al. v. The United States, decided at the last term, this question was settled.

This is an official bond, and was given in pursuance of a law of the United States. By this law the conditions of the bond were fixed, and also the manner in which its obligations should be enforced. It was delivered to the treasury department at Washington, and to the treasury did the paymaster and his sureties become bound to pay any moneys in his hands. These powers, exercised by the federal government, cannot be questioned. It has the power of prescribing, under its own laws, what kind of security shall be given by its agents for a faithful discharge of their public duties. And in such cases, the local law cannot affect the contract; as it is made with the government, and in contemplation of law, at the place where its principal powers are exercised.

As there was no evidence before the jury that any part of the defalcation of the paymaster occurred without the limits of the district in which, as appears by the bond, he was to act; the court below might well instruct the jury, that in the absence of such proof, they were bound to presume that the deficiency took place within the district.

The rejection of the special verdict by the court, is the ground which seems most to be relied on for a reversal of this judgment.

In 1817 the legislature of Louisiana enacted, that " in every case to be tried by a jury, if one of the parties demands that

the facts set forth in the petition and answer should be submitted to the said jury, to have a special verdict thereon, both parties shall proceed, before the jury are sworn, to make a written statement of the facts so alleged and denied, the pertinency of which statement shall be judged of by the counsel and signed by the judge, and the jury shall be sworn to decide the question of fact or facts so alleged and denied," &c.

On the 26th of May 1824, congress passed an act entitled " an act to regulate the practice in the courts of the United States for the district of Louisiana; in which it is provided, that the mode of proceeding in civil causes in the courts of the United States, that now are, or hereafter may be established in the state of Louisiana, shall be conformable to the laws directing the mode of practice in the district courts of said state: provided that the judge of any such court of the United States may alter the times limited or allowed for different proceedings in the state courts, and make, by rule, such other provisions as may be necessary to adapt the said laws of procedure to the organization of such court of the United States, and to avoid any discrepancy, if any such exist, between such state laws and the laws of the United States."

This section was a virtual repeal, within the state of Louisiana, of all previous acts of congress which regulated the practice of the courts of the United States, and which came within its purview. It adopted the practice of the state courts of Louisiana, subject to such alterations as the district judge of the United States might deem necessary, to conform to the organization of the district court, and avoid any discrepancy with the laws of the union.

By a code of the Louisiana legislature, passed in 1829, called the " Code of Procedure," the act of 1817 was repealed. This repealing act was not before the court until the present session; and a question is made under it, whether it does not, by virtue of the act of congress of 1824, change the practice of the district court. It is insisted, for the plaintiffs, that it could not have been the intention of congress, by the act of 1824, to subject the practice of the district court in Louisiana to any changes which the legislature of that state might adopt, in reference to the practice of the state courts: and the con-

struction which has been given to the act of 1792, which regulates process in the courts of the United States, is relied on as conclusive on the point. This act, by re-enacting the act of 1789, adopted the "modes of process" for the district and circuit courts, which were in use at the time of its passage in the supreme courts of the respective states, but did not require, as this court have decided, a conformity to the changes which might be made in the process of those courts. Nor did the act apply to those states which were subsequently admitted into the union. But this defect was removed by the act of the 19th of May 1828, which placed all the courts of the United States on the same footing in this respect, except such as are held in the state of Louisiana.

It does not appear that the district court of Louisiana, by the adoption of any written rule, has altered the practice which this court, in the case of Parsons v. Armor and Oakey, and Parsons v. Bedford and others, reported in 3 Peters, considered as having been adopted by the act of 1824. But, if the questions raised in these cases occurred after the act of 1817 was repealed by the code of procedure, in 1829, the fact was not known to the court. As the act of 1824 adopted the practice of the state courts before this court could sanction a disregard of such practice, it must appear, that, by an exercise of the power of the district court, or by some other means, the practice had been altered.

It is not essential that any court in establishing or changing its practice should do so by the adoption of written rules. Its practice may be established by a uniform mode of proceeding, for a series of years, and this forms the law of the court.

In the case under consideration, it appears that the Louisiana law, which regulated the practice of the district court of Louisiana, has not only been repealed; but the record shows, that in the year 1830, when the decision objected to was made, there was no such practice of the court as was adopted by the act of 1824. The court refused to suffer the statement of facts to go to the jury for a special finding, because they say, "such was contrary to the practice of the court."

On a question of practice, under the circumstances of this case, it would seem, that the decision of the district court, as

[Duncan v. The United States.]

above made, should be conclusive. How can the practice of the court be better known or established, than by its own solemn adjudication on the subject?

In regard to the last error assigned, it is not perceived how the refusal of the special verdict precluded the defendants from proving that the bond was delivered as an escrow. Such evidence was admissible under the plea or answer of the defendants; but it does not appear that any such was offered and rejected by the court.

The judgment of the district court must be affirmed, with costs.

This cause came on to be heard on the transcript of the record from the district court of the United States for the eastern district of Louisiana, and was argued by counsel: on consideration whereof it is ordered and adjudged by this court, that the judgment of the said district court in this cause be, and the same is hereby affirmed, with costs and damages, at the rate of six per centum per annum.