**DOWLING v. ISTHMIAN S. S. CORPORATION.**

**No. 9948.**

United States Court of Appeals
Third Circuit.

Argued Oct. 14, 1949.

Decided Aug. 30, 1950.
Rehearing Denied Nov. 15, 1950.

Herman Moskowitz, Philadelphia, Pa., for appellant.

Timothy J. Mahoney, Jr., Philadelphia, Pa. (Thomas E. Byrne, Jr., and Krusen, Evans & Shaw, all of Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN and KALODNER, Circuit Judges, and FEE, District Judge.

JAMES ALGER FEE, District Judge.

Dowling, a seaman, sued the Isthmian Steamship Corporation to recover wages, statutory penalties and subsistence. Isthmian noticed deposition of Dowling, which he moved to vacate. This was denied. An appeal taken from this order was dismissed because not a finality. Thereafter, the District Judge ordered Dowling to appear for oral examination at a time and place to be agreed upon between the parties. Dowling appeared according to the terms of the order, but upon advice of counsel, refused to be sworn or to submit to examination. Judgment was thereafter "entered against the Libellant and in favor of the Respondent by reason of the failure of the Libellant to submit to an oral examination by the Respondent, as required by the Order and Decision of this Court." Appeal was taken from this order.

The chief question is whether a federal court, sitting in admiralty, has the power to compel a party orally to answer questions regarding matters involved in a libel filed therein?

The question of whether discovery can be obtained from a party, although debated, is really not raised, since libelant refused to testify at all. The question of whether witnesses can be examined by deposition is not strictly relevant, since examination of a party is sought. The question of whether the testimony of a party by oral deposition, rather than by written interrogation, can be taken alone is involved. Finally, what may be done under the Admiralty Rules does not necessarily come before us, since here the party was directed to answer by order of court.

■ The key postulate might· well be disposed of by saying that due process has been granted and that rulings upon practice and procedure are within the sound discretion of the Admiralty Court.[1] However, since these matters have been seriously urged in argument, all will be discussed.

■ It is passing strange that such a point should be debated at this period of history, in admiralty and in respect to jurisdiction. For now, it is accepted, contrary to what had·been thought previously,[2] that power of discovery, limitless except by protective orders of the court, can be permitted by rule as of course in common law actions. To old admiralty procedure, our modern systems are in debt for characteristic features and customs of extreme liberality and flexibility.[3] It is surprising to find an attempt made to effect a spasticity more crippling than that now in the course of common law.[4] Finally, an attack upon the power of a court to discipline a litigant for failure to obey an order to submit to exami-

1. " * * * nor would any constitutional rights seem to be involved. * * *." The Washtenaw, D.C., 163 F. 372, 375.

2. There are strongly urged upon us: Nudd v. Burrows, 91 U.S. 426, 442, 23 L.Ed. 286; Ex parte Fisk, 113 U.S. 713, 5 S. Ct. 724, 28 L.Ed. 1117; Union Pacific Railway Company v. Botsford, 141 U.S. 250, 257, 11 S.Ct. 1000, 35 L.Ed. 734; Hanks Dental Association v. International Tooth Crown Company, 194 U.S. 303, 304, 310, 24 S.Ct. 700, 48 L.Ed. 989. These were actions at law, where there had never been a tradition of discovery. Each was decided upon the construction of an act of Congress. The appellate court, by the illiberal view that it was against the spirit of the common law to permit discovery, cast the practice for fifty years in an iron mold, from which the Federal Rules of Civil Procedure, 28 U.S.C.A., have only just freed actions at law. Even under these Rules, trial practice had better be left to the sound discretion of trial courts unless due process is violated. However, these opinions, being based on common law, have no relevance when practice in admiralty is considered. Nudd v. Burrows, cited has no relation to the problem before the Court.

3. Holdsworth, History of English Law, Vol. XII, pp. 684-5.

4. " * * * the procedure of the ecclesiastical courts and the court of Admiralty * * * was very different from the procedure of the courts of common law and the court of Chancery * * *. These procedural differences, and the technical differences which resulted from them, were greater than those which separated the courts of common law from the court of Chancery." Holdsworth XII, 677. "Nothing can be more unlike, in its process, pleadings, proof, trial and remedy, than the practice of the courts of admiralty and of the courts of common law." Kent's Commentaries, 14th Ed., Vol. 1, p. 380-1. " * * * Stripped of the power to pursue these methods, there would be little left to distinguish a Court of Admiralty from a Court of equity or of law. * * *" The Epsilon, 6 Benedict 378, 389. " * * * as such courts in the exercise of their jurisdiction, are not governed by the strict rules of the common law, * * *." The Virgin, 1834, 8 Pet. 538, 33 U.S. 537, 549, 8 L.Ed. 1036 (Justice Story). " * * * this suit is in admiralty, a branch of the law not hampered by the rigid rules of the common law * * *." Toledo SS. Co. v. Zenith Transp. Co., 6 Cir., 1911, 184 F. 391, 399. " * * * admiralty, untrammeled by common-law rules of evidence, pursues its own methods of proof." Pennsylvania R. Co. v. Downer Towing Corporation, 2 Cir., 11 F.2d 466, 467. "Courts of admiralty have always professed to proceed upon equitable principles, unlike courts of law * * *." Rice v. Charles Dreifus Co., 2 Cir., 96 F.2d 80, 83 (L. Hand). " * * * a court of admiralty is not bound by all the rules of evidence followed in courts of common law." The Denny, 3 Cir., 127 F.2d 404, 408.

nation far transcends a claim of error for receiving in evidence a deposition taken contrary to rule. Such a claim strikes at the jurisdiction of the tribunal itself.[5]

 Some courts and textwriters seem to proceed upon the theory that Congress and the Supreme Court of the United States have attempted to limit the power of the Admiralty Courts to follow traditional and customary procedure by the adoption of the Admiralty Rules of Procedure, 28 U.S.C.A. While recognizing the traditions of the courts of instance jurisdiction, some of these seem to feel that the present text of the Admiralty Rules is a rigid legislative limitation of the power of the courts, and that therefore the tribunals acting under express rules are less constrained. This criticism fails to recognize the effect of both legislation and court rule.[6]

 The Constitution of the United States vests admiralty and maritime jurisdiction in the federal courts.[7] It is to be noted that this jurisdiction was very well understood both as to substantive and ad-

jective law by the founders, and was recognized as embracing "a system of procedure known and established for ages."[8] The first judiciary act[9] contained the clause: "* * * the forms and modes of proceedings in causes of equity, and of admiralty and maritime jurisdiction * * * shall be according to the course of the civil law."[10]

Although the nomenclature of the legislation was changed, the great body of procedure of the civil law was continued in effect by the statute of 1792,[11] which provides: "That the forms of writs, executions and other process, * * * and the forms and modes of proceeding in suits * * * shall be the same as are now used * * * in those of admiralty and maritime jurisdiction, according to the principles, rules and usages which belong to courts * * * of admiralty * * * as contradistinguished from courts of common law; except so far as may have been provided for by the act to establish the judicial courts of the United States, subject however to such alterations

5. In the arguments themselves, there was no reference to the vital difference in procedure as of course under rule and under order of court.

6. See Benedict's Admiralty, 1st Ed., § 358.

7. "The judicial Power shall extend to all Cases, * * * of admiralty and maritime Jurisdiction; * * *." Art. III, § 2.

8. The Magnolia, 20 How. 296, 61 U.S. 296, 303, 15 L.Ed. 909.

9. Act of September 29, 1789, ch. 21, § 2, 1 Stat. 93–94.

10. The full effect of the statute was to give approval to the actual practice, which all agreed was molded upon that of the English civil and ecclesiastical tribunals. "In the ecclesiastical courts, however, the influence of the civil is overpowered by that of the canon law; and in courts of equity its directions, though useful, are by no means predominant; but the court of admiralty, as the greatest of modern judges, Lord Hardwicke, has observed, proceeds entirely by the rules of the civil law, except in cases omitted, and therefore in that court a knowledge of the ancient practice of that law is indispensably necessary, and must be had previously to the study of the modern practice of that

court." Browne, A Compendious View of the Civil Law, and of the Law of the Admiralty, Vol. II, ch. VIII, pp. 348-9. "The proceedings are according to the course of the civil law * * *." Kent's Commentaries, 14th Ed. Vol. 1, p. 380. "* * * but when courts of law and equity differ, the practice of the admiralty resembles much more nearly that of the latter. This is explained in part by the fact that both have borrowed more freely and for a longer time from the civil law; * * *." Joshua Richmond & Al. v. The New Bedford Copper Company, 1874, 20 Fed.Cas. page 739, No. 11,800, 2 Low. 315, 316. "The procedure in the admiralty was taken from the civil law, and, as in equity, in early days evidence was by deposition. The original Judiciary Act (section 30 of the Act of September 24, 1789 [1 Stat. 88]), changed this as to both, and while the ancient practice became optional in equity after 1802 (section 25, Act of April 29, 1802 [2 Stat. 166]), the statute remained unchanged as to admiralty until the whole procedure was put into the hands of the Supreme Court in 1842." Judge Learned Hand in The P.R.R. No. 35, The Eugenia Moran, 2 Cir., 1931, 48 F.2d 122, 124.

11. Act of May 8, 1792, ch. 36, § 2, 1 Stat. 276.

and additions as the said courts respectively shall in their discretion deem expedient, or to such regulations as the supreme court of the United States shall think proper from time to time by rule to prescribe to any circuit or district court concerning the same: * * *."

In order to provide for uniformity in certain basic procedures, the Congress in 1842 gave to the Supreme Court of the United States the power to regulate the practice, including the obtaining of discovery by general rules binding upon the lower federal courts. This statute does not indicate any attempt to circumscribe the power of the lower courts themselves to follow the traditional procedure theretofore recognized by the statutes above quoted. The act[12] in part provides that: "* * * the Supreme Court shall have full power and authority * * * to prescribe * * * in suits * * * in admiralty * * * the forms and modes of taking and obtaining evidence, and of obtaining discovery * * * and generally to regulate the whole practice of the said courts, so as to prevent delays, and to promote brevity and succinctness in all pleadings and proceedings therein, and to abolish all unnecessary costs and expenses in any suit therein."

This power has been continued by Congress in the most recent statute,[13] which provides in part: "The Supreme Court shall have the power to prescribe, by general rules, the forms of process, writs, pleadings, and motions and the practice and procedure in admiralty and maritime cases in the district courts of the United States * * *."

It thus appears that there was a great body of procedure and practice which was adopted for the Admiralty Courts by statute and which these follow today. For a hundred years then, the Supreme Court has had

express authority to prescribe and regulate the forms and modes of taking and obtaining evidence and of obtaining discovery. The fact that this power has not been exercised does not indicate that there were no methods of obtaining discovery by the procedure of civil law. It merely indicates that the Supreme Court was satisfied with the existing flexible practice which then obtained.

What then were the modes of proceeding of the Admiralty Courts according to the course of the civil law, which the musty statutes give the tribunals of today the right to follow?

As is well known, the admiralty and marine doctrines, adopted by the early English courts, had roots in the foundations of law and custom, and were drawn from sources widely separated in time and space, as Rhodes, Wisby, Oleron and the Hanse Towns,[14] but in the course of centuries the practice was developed from the civil law tribunals and the ecclesiastic courts and widely differentiated from the procedure in the courts of common law.

When we speak of history, care must be exercised that all events be taken into consideration and that our interpretation accords with the spirit of the time of which we speak and not merely with the crabbed letters of the ancient text. Particularly is this true of practice and procedure of Admiralty. The civilians were a learned profession, who constituted a close-knit body.[15] In the struggle over jurisdiction, owing to purely local causes, the courts of the common law prevailed in England, and the scope of action allowed to tribunals of Civil and Canon law, of which Admiralty was one, became extremely restricted.[16] For this and other reasons, there were until very late no reports in admiralty. The permissi-

---

12. Act of August 23, 1842, ch. 188, § 6, 5 Stat. 518.

13. 28 U.S.C.A. § 2073.

14. "The admiralty * * * may be called a system of regulations embodied and matured by the most enlightened and commercial nations of the world. Its origin may be traced to the regulations of Wisbuy, of the Hanse Towns, The

Laws of Oleron, the ordinances of France, and the usages of other commercial countries including the English Admiralty." Concurring opinion, The Magnolia, 20 How. 296, 61 U.S. 296, 303-304, 15 L.Ed. 909.

15. Holdsworth, XII, 105.

16. Holdsworth, XII, 677.

ble steps in a proceeding were shrouded in mystery to the uninitiated, for these often depended upon an unverified oral tradition carried in memory or at most committed to secret notes for the practitioner's own eye.[17] The gulf which separated the technical environs of the Court of Chancery and the common law courts was not nearly as forbidding as that which cut off either of these from the procedural domain of the civilians. In the darkness [18] of these difficulties, the surviving indicia will be reviewed.

From very early times, the Admiralty Court of England, in its instance jurisdiction, took proof from witnesses in foreign lands by issuance of letters rogatory or of commissions.[19] These commissions were sent out on court order where the witness was absent from the jurisdiction and other now familiar conditions. In these courts, proofs were customarily taken in the jurisdiction immediately upon the initiation of the proceeding because of the nature of the situation and the tendency of witnesses to disperse.[20] Since "some of the parties or witnesses * * * are pressing to go to sea with the next tide," [21] commissions were issued under order in the jurisdiction for other good cause, in the discretion of the court. These proofs, taken by commission upon direction of the court, were often initiated by filing of interrogatories. The answers were paraphrased by the commissioners for filing in court. Such examinations were held in secret and the transcription thereof constituted the proofs, since testimony was never taken in open court, but presented to the judge by the proctors. These were the paper proofs decried by Coke,[22] with tongue in cheek, in the battle for jurisdiction. Difficulties were, of course, encountered in taking proof before the issues were made up, and it is apparent that any matters connected with the subject matter of the controversy or the transaction were inquired into.

Of critical interest to us is the fact that Admiralty could and did, by order of court (dedimus potestatem) "examine the parties themselves." [23] As to them, there was al-

---

17. E. S. Roscoe, Life of Lord Stowell, p. 34.

18. "The authors from whom this knowledge must be derived, give us little insight into the written pleadings and proceedings of antiquity, and usually speak as if all things were transacted *ore tenus*, in little short formulae, such as took place amongst our ancestors in earlier times: on such scanty information, therefore, we must build the best superstructure we can." Browne, Civil Law and Admiralty Law, London, 1802, Vol. II, p. 349.

19. The files of the Admiralty Court contain, among other things: " * * * articles for the examination of witnesses; interrogatories; * * * commissions for the examination of witnesses in causes, or, ex parte, in perpetuam rei memoriam; these were addressed sometimes to civilians or other persons in this country, and sometimes * * * to foreign courts or admiralties; * * *." Selden Society, Select Pleas in the Court of Admiralty, Vol. I, p. lxi; Introduction by Reginald G. Marsden.

20. "Merchants, Mariners, and Seamen, whose business and affairs are ordered here, ventulated at sea, and agitated beyond the seas, must have a quick and sudden dispatch of justice; that as they come in with one good wind, so they may go out with another: the Mariners cause admitteth no delay but must have a judge, and a settled place of judicature at all times in readiness for his dispatch: for whilest his cause is pleading for his right, his Ship is preparing for his Voyage; * * *." Exton, Maritime Dicaeologie, London, 1664, p. 28. " * * * he ought to make summary and hasty process from tide to tide, and from hour to hour, according to the law marine and ancient customs of the sea, without observing the solemnity of the law, * * *." Instructions to the Admiralty Judge about 13 Hen. IV, Black Book, Rolls Series, Appendix, Vol. i, p. 409. quoted by Roscoe, Admiralty Jurisdiction and Practice, 3rd Ed., London, 1903, p. 30.

21. Wynne, Life of Sir Leoline Jenkins i lxxxii, quoted by Holdsworth, I, 555.

22. Exton, Maritime Dicaeologie, London, 1664, p. 104.

23. The cloudiness of the practice of the civilians is to a certain extent dispelled as to examination of parties before trial by reference to the texts and the supporting authorities. A modern authority, which is apparently based upon a deep study of the sources, says: "The grant of a commission to examine witnesses within or without the kingdom was ap-

plied for if necessary, and at the discretion of the judge the oath of calumny could be administered to either of the parties. The principal party and his witnesses were produced and sworn, as in ecclesiastical causes, to undergo their examination at the time appointed by the judge, under a pecuniary penalty, * * *." Roscoe, Admiralty Jurisdiction and Practice, 3rd Ed., 1903, p. 39. This same statement, written by Dr. T. Lambert Mears, appears in Select Essays in Anglo American Legal History, Vol. II, p. 345. See The Niemen, 1 Dodson, 10; The Manchester, 1 W.Rob. 93. "According to the ancient practice of the Court of Admiralty, the plaintiff might require the defendant to give him a personal answer to it or, in other words, to file an answer to it on oath. But this practice had long fallen into desuetude before coming into force of the Judicature Acts. For the modern process by which a party may be required to answer interrogatories on oath is a much more convenient method of proceeding, and the fifth section of the Admiralty Court Act, 1854 (17 & 18 Vict. c. 78), which provided that personal answers might be filed without a commission having been taken out, has been repealed." Williams and Bruce, Admiralty Practice, 1902, p. 410, note (a). Holdsworth reviews the procedure of the ecclesiastical court, which was the basis of the procedure of the Court of Admiralty in civil cases. Hist. of English Law, Vol. XII, pp. 678–681. This exact historian is explicit upon this point: "The admiralty could issue commissions to examine witnesses abroad, and it could examine the parties themselves." Hist. of English Law, Vol. I, p. 555. The nearest to a contemporary expression is contained in Zouch, The Jurisdiction of the Admiralty of England, 1st Ed., London, 1663, p. 151, where it is said: "The merchant if he can avoid the admiralty where he must answer upon Oath, and proof may be made by Commission, thinks himself secure from any danger at the Common Law." These expressions conform with the sources. The only practical manual of procedure in the instance court was Clerke's Practice Curiae Admiralitatis, which was first published in 1667 in Latin. On page 55 of the edition of 1829 appears the following: Tit. 24: "If the principal being cited should appear to answer the charges contained in the libel, it is to be produced, and an oath administered to him, in the same manner and form as in ecclesiastical causes; and he is to be admonished to undergo an examination

by a day assigned by the Judge, under a certain penalty, sometimes of forty shillings or five pounds, at the will of the Judge and according to the importance of the cause. And if the party does not submit to the examination before the day appointed, he is to be charged with contumacy, and to be pronounced to have incurred the aforesaid penalty or mulct; and he is to be committed until he has paid it and submitted to the examination." This quotation from Clerke is of vital importance in considering the American practice. In Hall's Admiralty Practice, Baltimore, 1809, pp. 50–51, there is a reprint of this same title under the heading, "The production of the principal and the punishment to be inflicted upon him if he refuse to submit to an examination under oath." Clerke's Title 14 is also reprinted in Hall at pages 30 and 31, and reads in part: "The plaintiff is also obliged to find fidejussores * * * for the production of the plaintiff personally as often as he may be called. For take notice, that the plaintiff can use the personal answers of the defendant, to the allegations contained in the libel, or any other matter by him suggested and filed. So it is lawful for the defendant to make use of the personal answers of the plaintiff, to any matter of defence, whether by exceptions or by any other kind of allegations whatsoever, which are by him put in." Another jurist of England in high favor among the early admiralty lawyers of America is Brown, whose "A Compendious View of the Civil Law and the Law of the Admiralty," published in 1802 in London, refers to this practice also: "Each party is entitled at any time, even down to the hearing of the cause, to demand the answer of his adversary upon oath to every one of his pleadings: a manifest advantage in the practice of this court over that of courts of equity, where this benefit is confined to the plaintiff, unless the defendant has ground for filing cross bill.

"If the party decreed and cited to give in a personal answer doth not obey that citation or order, a citation viis & Modis issues; * * * If the party appear, he is sworn to give in his personal answer before a day assigned, which if he omits to do, he will be attached, and Clarke says may be liable to fine and pecuniary penalties." (Vol. 2, pp. 416-7). In the later editions, both of these works cite Oughton, Ordo Judiciorum, which was printed in Latin, London, 1738. It is a treatise upon the practice of ecclesiastical courts and is in dramatic form. A short excerpt will

most unlimited latitude. The libelant or the defendant had a right to demand the personal oath of the other party to the allegations of the latter's own pleading. Either party had the right, at any time after the opening of the proceeding, to appeal to the conscience of the opposing party. At the time of the arrest of defendant in a proceeding in personam, he was directed by the magistrate and was sworn by God and the Holy Evangels to undergo examination as to the subject matter of the libel and warned as to the consequences of contumacy, which involved imprisonment until he did submit to examination. The same result was obtained by other means from libelant. Since Admiralty could not use the sanction of excommunication, as did the ecclesiastical courts, reliance was placed upon the process of arrest and bail.[24] It is probable these proceedings could be had immediately upon the presentation of the libel. These courts thus permitted proofs from witnesses to be taken immediately.[25] Interrogatories might be attached to the libel and to the answer, to which the opposite party was required to respond. Finally, a complete examination of the other party as to any fact material to the issues could be had under penalty.

These various approaches may have been but phases of the same method. The liberality of the civil law procedure was such that any process which would accomplish the end was permissible. The striking circumstance is that each phase is for the purpose of obtaining specific information by

---

suffice (Titulus LXV): "II. Actor: Domine Judex, super Positionibus Libelli (per me, in hac Causa, dati) produco hanc Partem principalem, et peto, eam Juramento onerari, de fideliter respondendo Positionibus ejusdem: III. Tunc Judex dicat Reo: Manum Libro appone; Tu Jurabis (c), quod, omni Affectione, quam propriae tuae Causae geris, post posita, fideliter, et vere respondebis Positionibus Libelli, contra te [per talem, in tali Causa] in hoc Judicio, dati; de Scientia tua, in his quae proprium tuum factum concernunt, et de Credulitate (d) tua, in facto alieno: Ita te Deus adjuvet, et Sacra Dei Evangelia:" This likewise seems to be the implication of the passage contained in a treatise entitled "Ordo Judiciorum," which passage occurs on pages 190, 191, Vol. I, of the Black Book of the Admiralty, edited by Sir Travers Twist, London, 1871. In the limited material available to us in this country, we find one form of the commission for answers issued in the instance court. The direction is as follows: "We do therefore authorize and empower you * * * that you cause to come and appear judicially before you the before-named * * and that you give him his corporal oath upon the Holy Evangelists, in the form indorsed on these presents, to answer to the articles of the allegation beforementioned, and effectually examine him thereupon and cause his full answers to be faithfully reduced into writing * *." It has theretofore been recited in the document that, at the petition of one of the proctors, the Lieutenant of the High Court of Admiralty of England of George III had ordered that a commission be issued to require the party on oath "faithfully to answer to the positions or articles of an allegation * * * given in and admitted against him" in the cause. This document appears at pages 305-308 of the Formulare Instrumentorum, London, 1802, "Perused and Approved as Correct, by Sir James Marriott, Late Judge of the Said Courts."

24. III Blackstone Commentaries, pp. 108-9.

25. "To which may be added the Statute of 32 of Hen. 8, Chap. 15 and of the 43 of Elizabeth, Chap. 12 which direct, That such causes betwixt Seamen and Merchants shall be ordered summarily, and without delay, and as in discretion shall seem most convenient. All which was, and may be observed in the Court of the Admiralty, which in many causes proceed at any time, and in all causes summarily, and according to Equity, but neither is, nor can be observed in Courts of Common Law, which are open onely in Term times, and proceed in an ordinary and strict way. * * * Again, whereas in those courts the evidence must be produced at the Barr, before the Jury, Sea-men, and Mariners, which are many times necessary witnesses, for the reason before exprest, cannot be present without great prejudice to themselves and the trade of the Kingdome; But in the Admiralty Court they may be produced at any time, after the sute is begun, and their Examinations being taken in Writing, they have liberty to follow their own, and the common occasions." Zouch, Jurisdiction of the Admiralty, London, 1663, pp. 142, 148.

768

searching the conscience of the party. Discovery was then the specific end of all such examinations. These devices were for the purpose of allowing the other party to obtain admissions and to supply proof so that he would be relieved from the necessity of proving essential parts of his case.[26]

It was proper for the moving party to give warning after the appearance of the principal adverse party, that he would make an effort to obtain personal answers of the latter to the positions of the libel. The purpose of this was that, if he could by examination discover the truth of the facts alleged, the admission of his adversary would stand for proof and he would not be required to call witnesses. Partial confession

of the truth elicited by this method of discovery served pro tanto. The party was sworn truly and accurately to answer of his own knowledge as to those things which he had done himself and as to his belief concerning the doings of others.[27]

But the process was not confined to the libelant, as each party had the right to search the conscience of the other.

Although the prize jurisdiction had different roots,[28] it was vested in the same tribunal and judges. There, immediately when the prize came into court, those found aboard were examined under process of Admiralty upon a stock set of written interrogatories usually established by rule of

26. There seems to be no doubt that the purpose of these examinations was to search the conscience of the adversary concerning all matters material to the issues. This further appears manifest by an examination of the sources. In Oughton, ibid., Titulus LXII, the matter is made abundantly plain, as this excerpt will show: "De Decreto Personali, contra Partem principalem, ad respondendum Positionibus Libelli. I. Actor cavere debet, ut, post Litis Contestationem, procuret (quam cito possit) Responsa Partis principalis adversae, Positionibus Libelli; ut [si ejus Intentio fuerit, ex Adversarii Confessione, fundata] procedere possit ad Conclusionem, et Sententiam in Causa, sine Testibus: Vel, si ex hujusmodi Responsis, in aliquo Articulo, fuerit relevatus, poterit, super caeteris Articulis, producere Testes; et ita exonerare Clientem suum, ab Onere probandi Articulos confessatos. II. Decretum hujusmodi pro Parte principali, curare debet Actor concipi, ac sub Sigillo Judicis communiri et exequi contra Partem Ream; coque executo concipere Certificatorium, in Dorso ejusdem, et illud die Comparitionis exhibere; et si Reus comparuerit, cum producere [ut in Titulo, De Productione Partis Principalis, &c.] et si non comparuerit, accusare ejus Contumaciam, et petere eum excommunicari [ut in Titulo, De Exhibione Citationis, coram Judice, &c.]" Further indications, moreover, are found in the Black Book of the Admiralty, Vol. I, pages 190-1. The text reads: "II. Lite contestata de calumpnia jurato fiunt probaciones in lite, set quia manifesta non indigent probacione, et manifestum seu notorium dicitur quod ex

confessione facta in lite liquet, ideo de interogacionibus quae in lite fiunt est videndum. Fiunt ergo interogaciones post litem contestatam, quae et dicumtur probaciones ad probandum. Ideo quo principaliter queritur quia merita causarum parcium assercione pandantur, facta interogacione si adversae partis sequatur confessio, non est super eo quo quesitum est alia probacio oportuna, quia confessus in jure pro judicato hagetur. Interogans autem et respondens veritatem dicere tenetur per sacramentum causae. Quia in sacramento causae continetur (?) ne quis exigat probacionem ab adversario quam necessariam non putat. Verum quoniam aliquando ad interogacionem sequitur confessio, idcirco de confessione dicatur. Est igitur confessio certa et clara adseveracio vel responsio ejus do quo queritur in jure coram legitimo judice facta."

27. Oughton, Ordo Judiciorum, London, 1738, Titulus LXV.

28. "But we are all of opinion, that there is nothing in this objection. No proceedings can be more unlike than those in the courts of common law and in the admiralty. In prize causes, in an especial manner, the allegations, the proofs and the proceedings are, in general, modelled upon the civil law, with such additions and alterations as the practice of nations and the rights of belligerents and neutrals unavoidably impose. The court of prize is emphatically a court of the law of nations; and it takes neither its character nor its rules from the mere municipal regulations of any country." The Adeline (1815), 9 Cranch. 244, 13 U.S. 244, 284, 3 L.Ed. 719.

court, but designed to elicit by the method of discovery all incriminating facts.[29]

Owing to the prohibitions issued by the courts of common law, instance jurisdiction was confined almost exclusively to proceedings in rem.[30] With the practical extinction of libels in personam, the opportunity and occasion, after arrest of the principal, for discovery by commission or dedimus potestatem were lacking. The conflict caused the decline in business of the court at which Pepys gazed in wonderment, and occasioned the "dosey, old-fashioned, time forgotten, sleepy-headed little family" parties which Dickens saw with jaundiced eye. But it must not be forgotten that in this forum were laid the foundations of admiralty substantive law and procedure, and that disuse did not spell loss of highly developed technical procedure.[31] Among these we have seen were the power of the court to direct by order that a party disclose, upon a search

of his conscience, any fact relevant to the controversy.

■ This system of admiralty procedure, so established in England, was adopted by the Constitution of the United States and the federal statute, as above noted. There were significant changes, however, made by express statutory provisions. No better proof of the complete adoption of the system could be found than the fact that Congress was impelled by necessity to change the existing procedure by definite enactment. On the other hand certain ancient devices such as the oath of calumny and suppletory oath were discarded as burdensome inconveniences of the older procedure.[32] A definite Act[33] required that testimony in admiralty cases be taken in open court viva voce.

It is difficult to understand the contention of appellant that this law, which changed

29. "The Judge or Judges of such Court of Admiralty, or other Person thereto authorized, shall, within five days after Request, finish the usual preparatory Examination of the Persons commonly examined in such Cases, to inquire, whether the Capture be lawful Prize or not; * * *." Molloy, De Jure Maritimo, London, 1769, 9th Ed., Vol. II, p. 18.

30. In Hall's Admiralty Practice (1809), a comment calls attention to the fact that, since admiralty was then confined almost entirely to proceedings in rem, the learning of Clerk concerning arrest and bail "is become almost obsolete." Page 51.

31. Because of the conflict of the admiralty judge with the common law courts, the treatises and reports of opinions relating to ecclesiastical law and practice, which was the other field cultivated by the civilians, are more common. Since identical methods were used in both fields, the literature and decisions of procedural import in one are available for both. It will be noted that many of the texts cited here deal exclusively with ecclesiastical practice.

The following cases, relating to the methods of pleading and discovery in the ecclesiastical field may throw light upon the problem here involved: Jehen v. Jehen (1753), 1 Lee 161, 161 Eng. Rep. 101; Winchlow v. Smith (1753), 1 Lee 417, 161 Eng.Rep. 153; Robbins v. Sir William Wolseley (1754), 1 Lee

616, 161 Eng.Rep. 225; Mayo v. Brown (1754), 1 Lee 570, 161 Eng.Rep. 210; Dalrymple v. Dalrymple (1811), 2 Hagg. 54, 161 Eng.Rep. 665; Best v. Best (1814), 2 Phill. 161, 161 Eng.Rep. 1107; Clutton v. Cherry (1816), 2 Phill. 373, 161 Eng.Rep. 1173; Clarke v. Douce (1816), 2 Phill. 335, 161 Eng.Rep. 1162; Morgan v. Hopkins (1818), 2 Phill. 532, 161 Eng.Rep. 1238; Oliver v. Heathcote (1824), 2 Add. 35, 162 Eng. Rep. 208; Maclas v. Ewing (1828), 1 Hagg. 317, 162 Eng.Rep. 598; Swift v. Swift (1832), 4 Hagg. 139, 162 Eng.Rep. 1399; Dysart v. Dysart (1843), 3 Curt. 543, 163 Eng.Rep. 819; Saunders v. Saunders (1847), 1 Rob. 549, 163 Eng. Rep. 1131; King v. King (1850), 2 Rob. 153, 163 Eng.Rep. 1275; Geils v. Geils (1851), 10 Eng.Rep. 108; Lowe v. Lowe (1855), 1 Deane 130, 164 Eng.Rep. 525.

32. The discard of the oath of calumny is noted in the case of Pratt v. Thomas, 1837, 19 Fed.Cas. page 1263, No. 11,377, 1 Ware 437, 439–440. It is further stated that the courts of this country require nothing more than a general verification of the cause of action by affidavit in the first instance. "No instance is known in which these oaths have been adopted in * * * the United States." Dunlap, Admiralty Practice, p. 251.

33. Act of September 24, 1789, ch. 20, § 30, 1 Stat. 88

the ancient practice, will not authorize a court to require a party to answer orally instead of answering formal interrogatories.

 Congress extended the ancient practice of depositions de bene esse under the familiar conditions to all the courts of the United States,[34] and by the same statute, lest confusion should arise, expressly preserved [35] the power of appropriate courts to order testimony taken in memoriam rei perpetuandum and under dedimus potestatem,[36] and to issue letters rogatory. The

34. "And when the testimony of any person shall be necessary in any civil cause depending in any district in any court of the United States, who shall live at a greater distance from the place of trial than one hundred miles, or is bound on a voyage to sea, or is about to go out of the United States, or out of such district, and to a greater distance from the place of trial than as aforesaid, before the time of trial, or is ancient or very infirm, the deposition of such person may be taken de bene esse before any justice or judge of any of the courts of the United States, or before any chancellor, justice or judge of a supreme or superior court, mayor or chief magistrate of a city, or judge of a county court or court of common pleas of any of the United States, * * *." Act of September 24, 1789, ch. 20, § 30, 1 Stat. 88–89.

35. "That nothing herein shall be construed to prevent * * * depositions taken in perpetuam rei memoriam, which if they relate to matters that may be cognizable in any court of the United States, a circuit court on application thereto made as a court of equity, may, according to the usages in chancery direct to be taken." Act of September 24, 1789, ch. 20, § 30, 1 Stat. 90.

36. The dedimus potestatem (we confer power) was a grant of authority by the court to a certain person to perform an act, such as conducting the examination of a party in order to obtain his responses to the positions of the libel or to take his answers to specially prepared interrogatories. The process is described as a commission. Usually the designee was of an official class because one of the essential functions of the court was delegated. An order of court was therefore essential. The court controlled the conditions of issue and of examination, limited only by self restraint in the light of tradition. The textwriters indicate the uncontrolled discretion of the court. "It seems, nevertheless, to have been supposed by Mr. Dunlap, that depositions may lawfully be taken on commission, in that court, in any case, without regard to the residence of the witnesses [(b) Dunlap's Adm. Pract. 251] and I am assured that such is the practice, to a considerable extent, in the district of Massachusetts." Conkling, U. S. Admiralty, Vol. II, p. 284-5. "Depositions may also be taken by a dedimus potestatem, under a commission issuing from the court, and when so taken, are not to be considered as taken de bene, but absolute, and may be used without reference to the accessibility of the witness." Parsons, Shipping (1869), Vol. II, p. 447, citing Rutherford v. Geddes, 4 Wall. 220, 18 L.Ed. 343. "A commission to examine may be issued before issue joined * * *; but special circumstances must be disclosed to warrant it * * *." Hall, The Practice and Jurisdiction of the Court of Admiralty (1809), p. 58. An order to take depositions issued in any case where it was necessary, in order to prevent a failure or delay of justice. Cohen, Admiralty Jurisdiction Law and Practice (1883), App. p. 349, § 866. A commission or dedimus potestatem was the vehicle for obtaining the answers of the adverse parties. "The answer, as a pleading or method of defence, was not known to the civil law, or introduced in the early practice of the Ecclesiastical Courts. It was drawn compulsorily from the defendant as part of the libellant's proof, * * * and might be obtained by calling the defendant into Court, and having him there interrogated by the judge to the articles of the libel, or by the defendants giving his answers in the form of a deposition. * * * As no oath could be compelled until after contestation of suit, which determined what points were in controversy between the parties, and the oath was then required, not to the whole case, but to the positions or specific interrogatories propounded by the promovent, it might well be that, in the civil law, the answer was hardly regarded in the character of a pleading * * *." The Mary Jane, Blatchford & Howland's Reports (1833), pp. 390, 394–6. Subsequently this procedure was less in use, owing to the practice of filing formal answers under oath in writing. The practice of filing written responses to interrogatories, appended to the libel or the answer, alleviated the necessity of a commission or dedimus potestatem to

statute permitting taking of depositions de bene esse was not a limitation upon the power of the federal courts to have testimony taken in other ways.[37] Thereafter testimony was taken of parties and witnesses on interrogatories before commissioner and otherwise, and by deposition viva voce under varying conditions. The methods were never mutually exclusive,[38] but, by the express terms of the law, existed side by

take the deposition. But throughout the history, the latter has remained a favored method. "The issues in the case are not complicated nor unusual in their nature. I am of the opinion, therefore, that an ordinary commission with interrogatories will be entirely adequate and will protect the rights of both parties. This is in accordance with 'common usage' under section 866 of the Revised Statutes * * * as established by rules 31 to 40 of the Admiralty Rules of this court, adopted * * * 1901, and is in accordance with rule 46 of the new Admiralty Rules promulgated by the Supreme Court, to take effect March 7, 1921 * * * which provide for the taking of testimony orally in open court, except as otherwise provided by statute or agreement of parties." The Sun, D.C. E.D.Pa., 1921, 271 F. 953, 954. Benedict, writing in 1850, says: "By the proviso to the 30th section of the Judiciary Act, every Court of the United States is clothed with the power to grant a dedimus potestatem, or commission to take depositions, according to the common usage, when it may be necessary to prevent a failure or delay of justice. This remedial proviso, with its beneficial purpose fully and distinctly set forth, cannot be construed otherwise than to give the courts the fullest power, in every manner usual in courts of justice, to depute their own power to take testimony in a cause where the ends of justice will be promoted by doing so." Thereupon the classic author clearly and succinctly states that the limitations upon the exercise lie entirely within the discretion of the Admiralty Courts: "The circumstances under which, and the mode in which the application may be made to the Court, may be regulated by standing rules of the Court, or left to the discretion of the Court in each particular case." Benedict Adm., 1st Ed. (1850) § 531. It is nowhere in the American authorities, so far as we have been able to find, that there is a lack of power of the Court to order a party examined for purposes of discovery, prior to the ultramodern phase of opinion.

37. This proposition is stated by all writers and, indeed, appears in the express terms of the law. "And the provisions of sections eight hundred and sixty-three, eight hundred and sixty-four, and eight hundred and sixty-five, shall not apply to any deposition to be taken under the authority of this section." Cohen, Admiralty Jurisdiction, Law, and Practice (1883), App. p. 349 § 866. See also Dunlap, 2nd Ed. (1850), p. 225, Conkling, Vol. II, p. 293.

38. Statutory depositions de bene esse could be taken ex parte as of course under strictly limited situations. If the deposition did not conform, it would be inadmissible. Conkling, Vol. II, p. 288.

The fact that depositions de bene esse could be taken ex parte made them quite unsatisfactory in certain situations. "Depositions de bene esse.— The provision made by the act of Congress, for taking testimony de bene esse, in cases in the Courts of the United States, without a commission, dedimus potestatem, or letters rogatory, greatly promotes ·the convenience of suitors. The depositions are often taken ex parte, and they are for that reason exposed to criticism. * * *" Benedict, Admiralty, 1st Ed., § 520. The dedimus potestatem was therefore entirely distinct from depositions de bene esse. "The depositions taken by commission from the courts of the United States are not considered as taken *de bene esse*, but are evidence in chief, and absolute, whether the witness be within or beyond the process of the Court." Dunlap, 2nd Ed., p. 225. "The only question then is, whether depositions taken a *dedimus potestatem* according to common usage, are, under any circumstances, to be considered as taken *de bene esse?* And it is the opinion of this court, that they cannot be so considered." Sergeant's Lessee v. Biddle, 4 Wheat. 508, 17 U.S. 508, 510, 4 L.Ed. 627. In fact, it was held that a dedimus potestatem would not be granted to take testimony which could be taken by deposition de bene esse. Turner v. Shackman, C.C., 27 F. 183. The fact that depositions de bene esse could be taken ex parte probably led to the use of this device under circumstances where permissible. But where discovery was sought from a party, the commission, on order of court, was the only possible method. The distinction between depositions de bene esse and examinations upon commissions is carefully observed in The Sisilina, D.C., 212 F. 1022, infra.

side. The statute requiring proof to be taken by word of mouth was long ago repealed,[39] but this mode of procedure has remained constant in the federal courts, both on trial and on either deposition or commission. Now, within recent months, the enactment confirming the use of dedimus potestatem and letters rogatory has been repealed.[40] But that establishes no barrier to the customary practices of the Admiralty Court.[41] The courts of instance jurisdiction could be deprived of authority to require a party to answer orally according to the accustomed modes of procedure only by express prohibition,[42] established by acts of Congress or Rule of the Supreme Court.

39. Act of August 23, 1842, Ch. 188, § 6, 5 Stat. 518.

Judge Learned Hand, who is well acquainted with all the traditions of the admiralty practice, and possesses an extremely accurate knowledge of the history of the procedure, says: "The procedure in the admiralty was taken from the civil law, and, as in equity, in early days evidence was by deposition. The original Judiciary Act (section 30 of the Act of September 24, 1789 [1 Stat. 88]), changed this as to both, and while the ancient practice became optional in equity after 1802 (section 25, Act of April 29, 1802 [2 Stat. 166]), the statute remained unchanged as to admiralty until the whole procedure was put into the hands of the Supreme Court in 1842." The P.R.R. No. 35, The Eugenia Moran, 2 Cir., 48 F.2d 122, 124, certiorari denied Pennsylvania R. Co. v. Shamrock Towing Co., 284 U.S. 636, 52 S.Ct. 19, 76 L.Ed. 541. This case is cited by Mr. Justice Brandeis, dissenting in Crowell v. Benson, 285 U.S. 22, 78, 52 S.Ct. 285, 303, 76 L.Ed. 598, where he says: "In federal equity suits, the taking of evidence on any issue in open court did not become common until 1913, * * * and in admiralty it was not required by the rules of this Court until 1921 * * *. On appeals in admiralty, further proof is now taken by a commission." And in a footnote the following appears: "Subsequent to 1842, when the procedure in admiralty became subject to rules promulgated by this Court, and prior to 1921, no rule specifically required that evidence be taken orally in open court, and the practice in some districts appears to have been to take proofs by a commission."

40. Act of June 25, 1948, ch. 646, § 39, 62 Stat. 992, which repealed §§ 644 and 653 of 28 U.S.C.A.

41. The most accurate statement of this position is found in The Henry S. Grove, D.C., 287 F. 247. See Note 63.

42. Judge Hulbert, of the Southern District of New York, in passing upon motions to sustain exceptions of libelant to interrogatories, made an extremely clear statement of the position that the powers of the Admiralty Court are not restricted where neither a statute nor a Supreme Court rule interferes. "There has long been a disparity in rulings of different judges upon exceptions to interrogatories in Admiralty. * * * Judge Mandelbaum, in American Mfg. Co. v. The Exermont and American Export Lines, D.C.S.D.N.Y., 1 F.R.D. 574, 575, * * * said: ' * * * Certainly the discovery of the truth in a suit in admiralty is just as much the purpose of the admiralty rules of practice and procedure as it is of the Federal Rules of Civil Procedure in civil actions, and I cannot see that the limitation of discovery by way of interrogatories to those issues upon which the interrogating party has the burden of proof will aid this purpose. * * *' I agree with my colleague in principle but not in procedure. * * * the Federal Rules of Civil Procedure, except in so far as they have been embodied in the new Admiralty Rules, have no application to Admiralty. * * * In Suspine et al. v. Compania Transatlantica Centroamericana S.A. et al., D.C.S.D.N.Y., 37 F.Supp. 263, * * * I had occasion to indicate a contrary view. As pointed out in that opinion, the liberality of the admiralty practice was emphasized in The Henry S. Grove, D.C., 287 F. 247, where the court said there was nothing in the rules proscribing the right of either party to require disclosure of matters touching the case or defense of the opposite party, as the Federal Rules of Civil Procedure now authorize in civil actions, and that Supreme Court Admiralty Rule 44 then provided, and still reads: 'In suits in admiralty in all cases not provided for by these rules or by statute, the District Courts are to regulate their practice in such a manner. * * *' * * * A judge presiding at an Admiralty Term should not be less zealous to restrict a search for the truth when the method employed does not contravene either a statute or a rule, than the liberality allowed under the Federal Rules of Civil Procedure in a civil action. The admiralty practice is a liberal and enlightened one and should be interpreted with the same spirit

It is urged that the Supreme Court of the United States has evinced an intention to withhold from District 'Courts the power to require parties to undergo examination by oral deposition. But the inference is only that the Supreme Court has been satisfied with the exercise of traditional powers of the Admiralty Courts, and has not seen fit to interfere.[43]

There is a violent conflict among the ultra-modern opinions, written since the adoption of the recent statute and the amendments to the Admiralty Rules by the Supreme Court of the United States.[44] These decisions will not be considered. In general, these seem to depend upon the feeling of the judge as to whether the particular discovery should or should not be permitted. Of course, this is the vital test upon practice questions. The formulation of practice and procedure is accomplished by bench and bar by feel. But the conclusions of these opinions should have been formulated in terms of empiricism rather than in terms of power of the court.

■ The Supreme Court did adopt Rule 44½ of Admiralty Rules, providing for pre-trial conferences in admiralty cases, with a view to clarifying the issues and obtaining admissions.[45] Since, at that time, a great many of the federal courts were requiring the presence and examination of parties on oath as an incident of framing the issues at pretrial conferences, in civil cases it must be believed this Rule, in the same terms, was adopted for admiralty courts by the Supreme Court in the light of these facts cum onere. The practice was adopted with the text of the Rule when later incorporated into the admiralty system.

■ If the matter were to be judged upon the text of the Rules alone, still the classic canon announced by the Supreme Court, speaking through Mr. Justice Brandeis in Washington-Southern Navigation Company v. Baltimore & Philadelphia Steamboat 'Company, 263 U.S. 629, 632, 635, 44 S.Ct. 220, 221, 68 L.Ed. 480, is still valid. There it was said:

"To ascertain the true meaning of the rule, it must be read, also, in the light of the established admiralty jurisdiction, of the general principles of maritime law, and of the appropriate function of rules of court.

of liberality, where the power of the court is not otherwise constricted, as the practice in civil actions." Citro Chemical Co. of America v. Bank Line. Limited, S.D.N.Y.1941, 1 F.R.D. 638, 640–641.

43. Judge Woolsey explicitly emphasizes the growth of practice in the instance courts unfettered by legislation or Rule. "Since the Act of Congress of August 23, 1842 (5 Stat. 516), the Supreme Court of the United States has been vested with power to make rules governing the practice of the District Courts in Admiralty. The result of the rules promulgated by the Supreme Court from time to time, of the ancillary rules put in force from time to time by the District Court, and of the decisions construing and developing both sets of rules, is a procedure which, while not yet perfected, is simple and on the whole satisfactory. The reason for this fortunate result is that admiralty procedure has not been hampered by legislation, but has developed from precedent to precedent." Munson Inland Lines, Inc., v. Insurance Co. of North America, D.C., 36 F.2d 269, 270.

44. The following cases discuss the problem generally with an implication that the Admiralty Rules are limiting factors. Kelleher v. United States, D.C.S.D.N.Y., 88 F.Supp. 139, 1950 A.M.C. 319; The Edmund Fanning, D.C.S.D.N.Y., 88 F. Supp. 895; Mulligan v. United States, D.C.S.D.N.Y., 87 F.Supp. 79; Haffel v. United States, D.C.S.D.N.Y., August 12, 1949;* The Ballantrae, N.J., 1949 A.M.C. 1999; Gulf Oil Corporation v. Alcoa Steamship Company, S.D.N.Y. 1949 A.M.C. 1965; Galperin v. United States, E.D.N.Y.1949 A.M.C. 1907; Bunge Corporation v. Steamship Ourania Gounaris, S.D.N.Y.1949, A.M.C. 744; Havrisko v. United States, D.C.E.D.N. Y., 68 F.Supp. 771; In re Agwi Nav. Co., D.C.S.D.N.Y., 9 F.Supp. 501; Mathews v. United States, D.C.E.D.N.Y., 5 F.Supp. 622; The Papoose, D.C.E.D.N. Y., 2 F.Supp. 43.

Discovery depositions of *witnesses* were ruled upon in The Tug Christine Foss, D.C.W.D.Wash., 15382.*

45. "Rule 44½. Pre-trial Procedure; Formulating Issues. Rule 16 of the Rules of Civil Procedure shall be applicable in cases in Admiralty. Added May 4, 1942." 28 U.S.C.A.1950 Supplementary Pamphlet, Admiralty Rules.

* No opinion for publication.

Before rule 53 was adopted, the general practice in admiralty concerning the giving of security had long been settled. * * *

"Most rules are merely a formulation of the previous practice of the courts. Occasionally, a rule is employed to express, in convenient form, as applicable to certain classes of cases, a principle of substantive law which has been established by statute or decisions. But no rule of court can enlarge or restrict jurisdiction. Nor can a rule abrogate or modify the substantive law. · This is true, whether the court to which the rules apply be one of law, of equity or of admiralty. It is true of rules of practice prescribed by this court for inferior tribunals, as it is of those rules which lower courts make for their own guidance under authority conferred."

But too much emphasis cannot be laid upon the factor that practically all the present day cases deal with an attempt to act under the procedure permitted by the text of the Admiralty Rules or the statutes, which still permit the taking of depositions de bene esse.[46] To the exact contrary, in the case at bar there was not any necessity to use the provisions of the Rules. The Court ordered the party to submit to examination as the ancient Admiralty Courts would have done—thereby exercising a power which was accorded to the courts of instance jurisdiction by common usage under the Constitution at the beginning of this government, confirmed by a declaratory statute, which was in effect for a century and a half and which represents a liberality of procedure far in advance of even the modern Rules of Civil Procedure.

It must be here observed that, since the statutes which permitted such examinations have been repealed,[47] there are but three possible positions. Either the Admiralty Rules must be construed to permit examination of a party before trial, or the District Courts have the power to pass rules or orders permitting such inquiries, or a common usage of these courts confirmed by statute for over one hundred fifty years has been lost.

[12] But even if it be conceded that the Supreme Court has not amended the text of the Admiralty Rules since the statutes have been repealed and thereby laid down procedure whereby depositions may be taken as of course, this fact would not prevent an Admiralty Court from ordering a party to give testimony before trial, if according to common usage.

An early statute granted to the District Courts, sitting in Admiralty, the power to "regulate the practice of the said courts respectively, as shall be fit and necessary for the advancement of justice, and especially to that end to prevent delay in proceedings."[48] This statute [49] is still in effect, with changes in verbiage.[50] In truth, the Supreme Court expressly confirms that power in the District Courts by Rule 44: "In suits in admiralty in all cases not provided for by these rules or by statute, the District Courts are to regulate their practice in such a manner as they deem most expedient for the due administration of justice, provided the same are not inconsistent with these rules." This Rule has been in effect since 1844.

The District Court, under the above Rule, could adopt a local regulation rein-

---

46. 28 U.S.C.A. § 639 [see note preceding revised 28 U.S.C.A. § 1781].

47. The statutory authority for issuance of commissions dedimus protestatem was modernly found in 28 U.S.C.A. § 644 [now Fed.Rules Civ.Proc. rule 26 et seq., 28 U.S.C.A.], that of letters rogatory in 28 U.S.C.A. § 653 [now 28 U.S.C.A. §§ 1781, 1782]. Both were repealed by Act of June 25, 1948, c. 646, § 39, 62 Stat. 992.

48. See The Steamer St. Lawrence, 1 Black. 522, 66 U.S. 522, 526–528, 17 L. Ed. 180.

49. Act of March 2, 1793, ch. 22, § 7, 1 Stat. 335.

50. "The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed by the Supreme Court." 28 U. S.C.A. § 2071.

stating the old practice,[51] since there has never been a specific Rule nor a statute upon the subject of examination of a party before trial. Inasmuch as the statutes regulating the conditions upon which depositions may be taken under dedimus potestatem, letters rogatory and commissions in perpetuam rei memoriam have been repealed and there is no express rule upon the subject, each District Court has the power under the Rule above set out to pass a local regulation.[52] Such a local rule must, of course, accord with common usage of the Admiralty Courts and fall within the limitations of due process, and controvert neither a statute nor a Supreme Court Rule. But what a District Court may do for all cases gen-

51. "The courts of the United States have never doubted their right to proceed under their general powers, as courts of admiralty, where they were not restrained from the use of those powers by statute." U. S. v. The Little Charles, 26 Fed.Cas. pages 982, 983, No. 15,613. "Powers as ample as legislation can give are conferred by law on the district court in cases of admiralty and maritime jurisdiction as to the 'forms and modes of proceeding,' * * *. The admiralty rules adopted by the supreme court do not provide for the case here presented; and by rule 46 [now 44] the pre-existing powers of the court in such cases are expressly recognized and affirmed to regulate its practice in admiralty 'in such manner as it shall deem most expedient for the due administration of justice.'" The Hudson, D.C., 15 F. 162, 175–176. "Whilst the practice thus formed on precedent has from time to time been embodied in rules by the Supreme Court which have caused a wise procedure in one court to be made universal in the admiralty courts of the United States, there has never been any tendency in the rules which the Supreme Court has promulgated to limit the freedom of the District Courts in adopting new rules or principles of admiralty practice on appropriate occasion, provided the practice adopted does not conflict with the Supreme Court rules." Judge Woolsey, in The Cleona, D.C., 37 F.2d 599, 600. "The supreme court have undoubted power to regulate the whole matter by the statute of 23d August, 1842, § 6 (5 Stat. 518); but this court has an equally undoubted power under the act of 8th May, 1792, § 2 (1 Stat. 276), unless the rule is either inconsistent with some action of the supreme court, or that court have avowedly covered the whole ground in any particular instance. The forty-sixth [now 44] rule recognizes this power, but does not create it." Louisiana Insurance Company v. Nickerson, 15 Fed. Cas. pages 967, 968, No. 8,539, 2 Low, 310, 313-14. " * * * there is no lack of power in the court to regulate its procedure so as to promote speedy and substantial justice. Both the statutes and the admiralty court rules, in cases not provided for, authorize the court 'to regulate its practice as is fit and necessary for the advancement of justice.' * * * This authority is a power held in trust for the benefit of litigants, and it is the duty of the court to exercise it in proper cases, by adapting its procedure to the practical needs of justice." The Alert, D.C., 40 F. 836, 838.

52. "The power of the District Court under section 731 of title 28 of the Code * * * in general to make rules for its own procedure, earlier in origin, but somewhat more limited in expression than that given the Supreme Court in equity and the admiralty under section 730 * * *, is perhaps in substance no less, though subject to the action of the higher court. Within its scope it is unquestionably valid and has been long exercised not only at common law * * but in the admiralty * * *. The Forty-Fourth Admiralty Rule of the Supreme Court * * * confirms it, and the respondent does not indeed dispute it. The argument is that it cannot be used to 'overrule' decisions of the Supreme Court or this court which have declared the pre-existing practice. This misconceives the office of a rule, which, while usually the codification of existing procedure * * * is not so confined. It is the result of the exercise of a power to legislate, delegated by Congress, though circumscribed by the statute which gives it, and by anything contained in the general laws, or the Supreme Court rules, as the statute itself declares. Within these limits the District Court may disregard existing practice as freely as Congress itself; its action has the force of law * * * and we are as much bound to observe it as a statute." Galveston Dry Dock & Construction Co. v. Standard Dredging Co., 2 Cir., 40 F.2d 442, 444.

erally by rule, it may also do in the individual case by order,[53] if the same limitations are observed.

■ It may be agreed that discovery from a party upon commission, which was once a common practice but which was less used in England,[54] owing to the factors which have been noted, was also apparently somewhat less exercised by practitioners in American courts.[55] Our belief

53. "Objection was also made by the respondent that the district courts have no power to establish the practice of permitting process in rem and in personam to issue upon the same libel. I do not think the objection is sound. In my opinion, rule 46 [now 44] gives the district courts ample power to establish such a practice, either by a formal rule, or by a decision directing the method of future procedure." The Planet Venus, D.C., 113 F. 387, 389. Although the following cases are not in admiralty, the principle announced is universal: "It is not essential, that any court, in establishing or changing its practice should do so by the adoption of written rules. Its practice may be established by a uniform mode of proceeding, for a series of years, and this forms the law of the court. * * * On a question of practice, under the circumstances of this case, it would seem, that the decision of the district court, as above made, should be conclusive. How can the practice of the court be better known or established, than by its own solemn adjudication on the subject?" Duncan's Heirs v. United States, 7 Pet. 435, 32 U.S. 435, 451. "It is not necessary that a practice of a court to be recognized or sustained, should be embodied in a written rule. Written rules are undoubtedly preferable, but a practice in respect to a particular matter in a court may be established without the existence of a positive written rule." United States v. Stevenson, 27 Fed.Cas. page 1326, 1328, No. 16,395, 1 Abb. 495, 501.

54. The practice of the English Courts in Admiralty, after the separation of the Colonies, continued a liberal course with regard to discovery. Perie v. Iron (1832), 8 Bing 143; The Manchester (1839), 1 W.Rob. 93; The Gypse (1842), 1 W.Rob. 370; The Prince of Wales (1848), 6 Notes of Cases 39; The Genessee (1848), 12 Jur. 401; The Chance (1857), Swabey Adm.Rep. 294; The Two Friends (1862), Lush. 552; The Mary or Alexandra (1868), 18 L.T. 891; The Murillo (1873), 28 L.T. 374. After the Judicature Acts, there has been no bar to discovery except restraint imposed by the judges to prevent abuses. The Biola (1876), 34 L.T. 185; Bolckow, Vaughan & Co. v. Yound (1880), 42 L.

T. 690; Bolckow, Vaughan & Co. v. Fisher (1882), 52 L.J.Q.B. 12; The Knutsford (1891), 64 L.T. 352, 39 W.R. 559, 7 Asp.M.L.C. 33; The Loch Maree (1895), Fos. 101 and 105, cited in Roscoe's Admiralty Practice, 5th Ed., pp. 316, 318. See generally The Laws of England, The Earle of Hallsbury, Vol. I, p. 129, § 201 and following; Mew's Digest of English Case Law, Vol. 18, p. 1534; Mayer's Admiralty Law and Practice (1916), 1st Ed., pp. 258, 260; English Empire Digest, Vol. I, p. 193.

The liberality of the modern practice appears from the following excerpts from the Rule: "The Court or a judge may, in any cause or matter where it shall appear necessary for the purposes of justice, make any order for the examination upon oath before the Court or judge or any officer of the Court, or any other person, and at any place, of any witness or person, and may empower any party to any such cause or matter to give such deposition in evidence therein on such terms, if any, as the Court or a judge may direct." Roscoe's Admiralty Jurisdiction and Practice (1903), London, 3rd Ed. p. 355, Order 37, Rule 5 (1875). "Causes may be proved by affidavits, by written depositions, or by oral examination of witnesses in open Court, or partly by one mode, partly by another. [As to affidavits, see Order 148 and the following Orders.]" "Written depositions may be taken either before an Examiner appointed by order of the Court under the Act, or before a Commissioner appointed under a Commission. [See the Act, ss. 51, 60.]" "In case of an examination before an Examiner or Commissioner of the Court, the Examiner or Commissioner may put any questions to the witnesses for the purpose of eliciting the truth as to him shall seem fit." Boyd, The Law and Practice of the High Court of Admiralty of Ireland (1868), General Orders 92, 94, 97 (1867).

55. It is probable that the provisions of the Admiralty Rules of 1844, XXIII and XXXII, which compelled the filing of responses to interrogatories appended to the pleadings, had the effect of offering an easier road. But the nuances of practice are mysterious. See local Rules.

is that the explanation lies in the fact that, since the answer came to be a formal document, verified by the party, and discovery by persistent interrogatories was available, and the party usually gave evidence on his own behalf, either in open court or by voluntary appearance before a commissioner, where he was available for cross-examination, it was not usual to seek to have an examination dedimus potestatem before trial. By a curious circumstance, this tendency to allow the practice to fall into disuse was accelerated by a perverse doubt as to the additional weight the testimony of a party obtained if so taken.[56] If the party, however, were otherwise unavailable, his testimony was often taken de bene esse, and then was usually given orally and transcribed. This, together with the fact that most procedures were in rem,[57] as above noted, caused disuse of this efficient device. The circumstance that the practice fell into desuetude does not detract from the power of the Court to act according to common usage adopted by the Constitution and statutes, unless it has been forbidden by Rule or express enactment. So, at least, the Admiralty Courts have proceeded. To their practice, we now turn.

The American Admiralty Courts adopted the ancient procedural flexibility, liberality and originality. At a time in this country when common law procedure was hidebound by technicality, the proceedings in admiralty were noted for "comprehensive brevity, celerity and simplicity."[58] The practice was almost exclusively "judge made" under the mandates above noted, and was based upon a "wisely administered convenience."[59] A jurist of our own time has said the procedure was "a liberal and enlightened one and should be interpreted with the same spirit of liberality."[60] But the daring originality of the practitioners and judges did not permit procedural hurdles [61] to

56. "It is frequently the case, that the answer of the defendant on oath to the libel is sought for in the prayer of relief, which the libellant has a right to require. * * * This practice is incorrect and unsafe, unless, in the opinion of the libellant or his proctor, it may be necessary to make an appeal to the conscience of the respondent, in order to substantiate the case; for, the answer being required to be on oath, and being so made, would, probably, in order to be disproved, require two witnesses, or one witness with strong corroborating circumstances, as is the case with an answer in Chancery." Dunlap, Admiralty Practice, 2nd Ed. p. 124 (1850). " * * * their depositions, like all ex parte examinations, are to be received with the greatest caution * * *." American Insurance Company v. Johnson, 1827, 1 Fed.Cas. page 665, 671, No. 303, Blatchf. & H., pp. 2, 30.

57. Hall, The Practice and Jurisdiction of the Court of Admiralty (1809), p. 51.

58. Kent, Commentaries, 14th Ed., Vol. I, p. 380.

59. The Cleona, D.C., 37 F.2d 599, 600.

60. Citro Chemical Co. of America v. Bank Line, Limited, D.C., 1 F.R.D. 638, 641.

61. The following instances of this spirit of liberality will suffice: "The case of The Hudson, D.C., [15 F. 175] * * * and the fifty-ninth rule in admiralty, though not literally applicable, furnish also an analogy for this order. A similar practice has been occasionally followed, where necessary, in cases not literally within the rule. The City of Lincoln, D.C., 25 F. 835; The John Cottrell, D.C., 34 F. 907; The Doris Eckhoff, D.C., 32 F. 555: Joice v. Canal-Boats, D.C., 25 F. 553." The Alert, D.C., 40 F. 836, 839. In this case, the court ordered codefendants brought into the case. "Courts of admiralty have always professed to proceed upon equitable principles, unlike courts of law; therefore if they were not to recognize equitable avoidances of transactions of discharge, it could not be because in substance the facts were irrelevant, but for some procedural reason. However, procedure in the admiralty is proverbially plastic". Rice v. Charles Dreifus Co., 2 Cir., 96 F.2d 80, 83. "An objection which I felt most difficulty in removing, was, that the bond was executed to the marshal, and that the valuation ought to have been made by commissioners appointed by the court. I believe there is no special act of congress prescribing the form of the bond, or the mode of valuing the property. * * * But I do not think the defendant can be permitted to avail himself of an irregularity to which he is himself a party, and which could only affect

handicap the quest for appropriate relief unduly. This untrammeled spirit was early exemplified here in a case where a statute established a right, but provided no machinery to carry it to completion. The procedure was established by the court. It was there said: "For the admiralty creates its own forms of proceedings, and adapts methods of its own to the varied necessities which present themselves to its consideration. The power to do this is part, and the important part, of the jurisdiction of the admiralty. * * * They accomplish this by ways unknown to other courts, and for many of which it were vain to look in any statute. Stripped of the power to pursue these methods, there would be little left to distinguish a court of admiralty from a court of equity or of law." The Epsilon, 8 Fed.Cas. page 744, 748, No. 4,506, 6 Ben. 378, 389.

This spirit is accurately expressed by one of the modern local rules: "In any matter not provided for in the Admiralty Rules of the Supreme Court of the United States or in these Rules, the court shall take such action and make such orders as may be just and equitable."[62]

the libellants." United States v. The Little Charles, Cir.Ct., 26 Fed.Cas. pages 982, 983, No. 15,613. Libel for damages brought by thirteen persons. Three of the plaintiffs filed a statement that the libel was brought without their consent, asking that their names be stricken. The three contend that a Court of Admiralty will follow the practice at law. "It would be easy to multiply quotations of a similar purport, but a brief review of certain well-known classes of decisions will be of more value than any general remarks, even of the most eminent jurists. Courts of admiralty have never had a statute of jeofails, and have never needed one. So far have they carried the power to allow amendments, that it has been laid down by the highest authority that an action can never fail for want of proper allegations, if merits clearly appear in the record. And several cases have been sent back from the supreme court, with orders to permit amendments and then to proceed to a decree. I am not speaking of amendments to introduce new facts, but those of either form or substance to conform to evidence. See The Adeline, 9 Cranch [13 U.S. 244] 244 [3 L.Ed. 719]; The Caroline, 7 Cranch [11 U.S. 496] 496 [3 L.Ed. 417]; The Anne, Id. 570; The Edward, 1 Wheat. [14 U. S. 261] 261 [4 L.Ed. 86]; Newell v. Norton, 3 Wall. [70 U.S. 257] 257 [18 L.Ed. 271]. These great powers are derived from the very constitution of the court, and the immemorial course of its proceedings. So it has more than all the powers of a court of equity, in permitting a joinder of actions, as where all the seamen, or all the salvors, of a vessel, though their rights may be totally distinct and several, are permitted, and even required, to join in one action. When the law did not permit parties to be witnesses, courts of equity would authorize plaintiffs to withdraw from a suit in order to testify, in some cases. Courts of admiralty permitted the testimony without requiring the withdrawal. So in these courts, either party can interrogate the other, and not merely the plaintiff the defendant as in equity. It has always treated seamen as equity treats wards, &c., and has set aside in their favor contracts, whether sealed or not, which were found to be oppressive. Within its sphere it has full and equitable powers to marshal legal and equitable liens on a ship or on any fund lawfully in its custody. These examples show the freedom from technical rules, and the analogy to the proceedings in equity, which were adverted to by the authors I have cited." Richmond v. New Bedford Copper Co., 20 Fed.Cas. page 738, 739, No. 11800, 2 Low. 315. Libelant owned one-sixteenth of the vessel and sued to recover his share of the proceeds of a whaling voyage. It is objected that the libelant cannot sue his co-owners. "Courts of admiralty are not restrained from doing substantial justice by mere forms or technicalities. Dupont De Nemours v. Vance, 19 How. [60 U.S. 162] 172 [15 L.Ed. 584]. * * The power which it possesses over its own final process will enable it to complete justice between the parties. * * The pleadings should be reformed so as to present the true issues." Dexter v. Munroe, 7 Fed.Cas. pages 616, 617, No. 3863, 2 Spr. 39. Hickman, Williams & Co., Inc., v. Murray Transp. Co., D.C., 31 F.Supp. 820, 822; The Director, D.C., 26 F. 708, 711; Joice v. Canal-Boats, D.C., 32 F. 553, 554.

62. Admiralty Rule 51 of the District of Canal Zone, effective August 1, 1945, "Adopted pursuant to Rule 44 of the Admiralty Rules of the Supreme Court of the United States." Former Rule 61

In accordance with this freedom to mold procedure pursuant to ancient practice, most of the District Courts of maritime standing recently adopted by rule, at the suggestion of the Solicitor General of the United States, standing interrogatories [63] to be propounded for the purpose of discovery to persons found on vessels taken as prizes in the latest war. No statute or Rule of the Supreme Court justified this resurrection of a long disused practice.

The function of interrogatories has been to continue the appeal to the conscience of either party.[64] The Rule of the Supreme

of the Canal Zone, effective December 30, 1938, provided, "These Rules shall be liberally construed with a view to effect their objects and to promote justice. When the code or other statute or these Rules fail to specify a procedure in any given case or matter, the court or the judge will adopt and follow the process or mode of proceeding which appears most suitable and conformable to the spirit of the code." Besides the debt which practitioners owe to the compilers of Knauth's Edition of Benedict on Admiralty for the careful and accurate statement of the peculiar rules of these complex doctrines, the collation of Rules of various courts relating thereto imposes an additional obligation.

63. "Standing Interrogatories in Prize," following Prize Rule 53 of the Southern District of California. For the earlier practice in prize cases, see Betts' Admiralty Practice (1838), pp. 71–8; 14 U. S. Reports Appendix 494–506; 15 U.S. Reports Appendix 1–86.

64. The appeal to conscience, which characterizes the ancient examinations of a party on commission or dedimus potestatem, continued to vitalize the requirement that a party answer on oath to the positions of adversaries pleading and the necessity of responding to interrogatories, whether appended to the pleading or specially propounded. The authority of Browne, Civil Law and Admiralty Law, and Clerke's practice as incorporated in Hall's Admiralty Practice in the Admiralty Courts, has been noted. The purpose of all these devices was to reduce the necessity of producing proof by the admissions of the adversary. In other words, discovery of the facts was the motivating purpose. First, the older method of seeking the response of the adversary under oath to the pleading prevailed. "Each party in admiralty has a right, if he chooses, to the answer under oath of the other; and if not so answering when requested, he may take the fact *pro confesso*. If an answer be given when asked for, it is evidence for either side." Jay v. Almy, 13 Fed.Cas. pages 387, 389, No. 7,236, 1 Woodb. & M., 262, 267–268. This case is modernly cited where this proposition was under consideration in Bock v. International Navigation Co., D.C., 124 F. 711. "By general rules of proceeding in Admiralty causes, the answer may be required upon oath. * * * The party, whose oath is required, is bound to appear personally in Court, or before a commissioner appointed by the Court, to take his oath to his pleading." Dunlap, Admiralty Practice (1850), pp. 190-1. The abandonment of this device as a method of discovery is silhouetted in the texts which were published at a somewhat later date. "To assist his proof, the plaintiff's proctor may apply for a decree (citation) against the defendant to give in his personal answers on oath to each article or paragraph of the libel within a time limited. This is a rare proceeding at the present day. * * * The object of requiring the party's sworn answers is the same in admiralty as in the Court of Chancery. It is to obtain from the respondent by his confession or admission, such evidence of a fact or series of facts as will obviate the necessity or save the expense of examining witnesses in proof of them." Coote, The New Practice of the High Court of Admiralty of England with The Rules of 1859. Some of the reasons for the abandonment of this method of discovery are also indicated. "By the old practice of the Court of Admiralty, the party on whose behalf any pleading was filed, was entitled to require the opposite party to file answers on oath thereto. These answers were altogether distinct from the pleadings on either side, and could not be read for the party making them, but only by the party requiring them. Since the statutory provisions removing the disqualifications of disinterested witnesses and the new practice of taking evidence viva voce, the taking of answers has fallen into disuse." Prich.Dig., 2nd Ed., p. 212, note 6. Therefore, the searching of the conscience by interrogatories became the more in vogue. As has been noted before, a contributing factor to this change was the debate over what use could be made of the answers of the

party on oath. The result was that the same purpose of discovery was generally served by special interrogatories rather than by interrogatories attached to the answer or to the libel. This is explained in the following excerpt: "There is, however, a very high authority bearing on this subject, that of the Chief Justice of the Supreme Court of the United States, who is reported to have ruled that, where the complainant calls upon the defendant, as in Chancery, to purge his conscience and disclose facts, by this appeal the answer is made evidence; but, in common Admiralty cases, where no such demand or appeal is made, and where the answer asserts a right affirmatively in opposition to the complainant's demand, it is not evidence. Generally, no possible advantage can result, but serious disadvantages may be the consequence of requiring, in the libel, the answer on oath of the defendant; for it is the settled practice, certainly in the District Court of the United States for the District of Massachusetts, for either party, at any subsequent period in the cause, to propound interrogatories to the adverse party, to be answered upon oath, when it may be deemed necessary by either party to appeal to the conscience of his adversary for the discovery of the truth. By the rules of the Circuit Court of the United States for the First Circuit, and by the rules of the District Court of the United States for the Southern District of New York, the plaintiff has a right, in suits of admiralty and maritime jurisdiction, to require the personal answer of the defendant on oath to interrogatories (a) to be filed by him, touching the allegations contained in the libel, or any matter or thing by him suggested and filed which shall be relevant to the suit; and the defendant has a right to require the personal answer of the plaintiff, on oath, to interrogatories filed touching any matter of defence, or exceptions, or any other allegation by him filed, which shall be relevant to the suit." Dunlap, Admiralty Practice, 2nd Ed., New York, 1850, pp. 125–6. The cases support discovery by these methods. "In any rational system of pleading, it is essential that the subject of litigation shall be reasonably defined, in order that the parties may know what they have to meet, that the case may be presented with intelligence, and the record restricted within appropriate limits, and useless expense avoided. It is the duty of the court to promote this end in all appropriate ways, in furtherance of

justice, in pursuance of rule 46 and section 918 of the Revised Statutes. * * Rule 32 authorizes such interrogatories 'touching any matter charged in the libel, or touching any of the matters set up in the answer.' Such interrogatories, derived from the practice of the civil law, are designed to supersede the necessity of proof, and to bring out distinctly before the court the point on which the defense or claim is intended to be rested." The Mexican Prince, D.C., 70 F. 246, 248. "And further, by the practice of the admiralty each party has a right to extract evidence in support of his case from the personal answers of his adversary. Besides the general answer of the defendant in which the libel is contested, the libellant has a right to require him to answer at the hearing any special interrogatories which he may put touching the matters in issue." The David Pratt, 7 Fed.Cas. pages 22, 23, No. 3,597, 1 Ware 509, 511. "Objection was made to the taking of the depositions before filing an answer, but no answer was filed until the depositions had been taken and filed, and the libellant thereupon, in due time, moved to suppress the depositions for this reason. It is conceded that there is no rule of practice that requires an answer to be filed before depositions are taken on behalf of the claimant, but the necessity of the adoption of such a rule is insisted on. * * * There is therefore no foundation for the motion to suppress in this case." The Pride of the Ocean, 19 Fed.Cas. pages 1323, 1324, No. 11,419, 10 Ben. 610, 613. In an action on a policy of insurance, on goods; one of the part owners of the vessel, not interested in the insurance, may be examined to prove the loss, and other facts. Ruan v. Gardner, 20 Fed.Cas. page 1295, No. 12,100, 1 Wash.C.C. 145. "But the liberality of the Admiralty practice is emphasized in The Henry S. Grove, D.C., 287 F. 247, where the court said there was nothing in the rules to show that it was intended to deny the right of either party to require disclosure of matters touching the case of defense of the opposite party." Suspine v. Compania Transatlantica Centroamericana, D.C., 37 F.Supp. 263, 265. "The law of Maine, admitting parties to be examined * * * does not in its terms apply to proceedings in the admiralty, and has been decided not to extend to this court; but according to the course of the admiralty, parties may always be examined on interrogatories on the demand of either party. Though the answer is not properly evidence, be-

Court, adopted in 1844, indicated that its purpose was to permit discovery of all relevant facts from the principal party,[65] thus continuing the early English practice.

ing drawn up by the proctors on the statement of the party (citing cases) * * * the answers to the interrogatories, subject as they are, to pass under the ordeal of a cross-examination contrary to the rule of the civil law, are." The Australia, 1859, 2 Fed.Cas. page 236, 237, No. 667, 3 Ware 240, 243. "Such answers to interrogatories are designed rather as compulsory amplifications of the pleadings on the specific subjects propounded in the interrogatories, so as to dispense with the taking of proofs, or evidence proper, on the facts that may be admitted. When the interrogatories are propounded by the libel, the replies usually make part of the answer itself. Dunl.Adm.Pr. 201. It is immaterial whether they are answered as a part of a pleading or separately. As evidence, they stand like the pleadings only. They are parts of the record, and may, like the pleadings, be referred to by either party. What is admitted, needs no further proof; but as respects matters which still remain at issue, such answers are not affirmative proof in favor of the party making them. Williams & B. Adm.Prac. (2d Ed.) 410." The Serapis, D.C.S.D.N.Y., 37 F. 436, 442. "The libelant has the right to interrogate the defendant as to each and every material fact in issue; but the rule requires the defendant's oath, and his oath only, in response thereto. It does not require him to produce documents, much of which would be hearsay, as mere evidence in the libelant's favor, or as a substitute for his own oath as regards the material facts in issue. * * The inspection of documents is a different matter, and is obtained, when allowed, by a different procedure, or under different rules. The English practice, * * * is founded upon express statutory provisions and definite rules of court. * * * We have no such statute * * *. I do not think the rule should be extended beyond its plain intention." Havermeyers & Elder Sugar Refining Co. v. Compania Transatlantica Espanola, D.C.S.D.N.Y., 43 F. 90, 91. The reason for this is set out by the learned Judge Hutcheson: "Raised, as I have been, in a blended jurisdiction, which does not recognize the equity practice of bill of discovery, but gives to each person the right in ex parte interrogatories to search his adversary as drastically as the art of cross-examination can devise, I am not much impressed with the refinements upon the practice

of discovery worked on it by courts operating in jurisdictions where the full right of disclosure provided by our ex parte practices does not exist." The Belfast Maru, D.C., 6 F.2d 89, 90. In any event, the continuity of the practice is shown by the texts: "As by the general rules of Admiralty practice the oath of either party may be required at any stage of the cause in support of his pleadings, in this respect there is an advantage, in the flexible and extensive practice of the Admiralty Court, over that of the Chancery; for, in the latter Court, the defendant cannot require the oath of the plaintiff, except by means of a cross bill and action." Dunlap, Admiralty Practice, p. 129. "One source of information and evidence is the parties to the suit; for, as has been before stated, either party may appeal, in any stage of the cause, before its conclusion, to the conscience of his adversary, and compel him to answer interrogatories respecting any matter pertinent to the cause." Dunlap, Admiralty Practice, p. 197. "Answers to Interrogatories.—The power to interrogate the parties furnishes an effectual means of bringing the party before the court, with great advantage, in abridging the more expensive and doubtful viva voce proof on trial. Either party, as has been stated, may interrogate the other, in writing, as to any matters of fact, which may be necessary to support the action, or maintain the defence, and the party interrogated is bound to answer, in writing, each interrogatory, unless his answer will expose him to prosecution or punishment for a crime, or to a penalty or forfeiture of his property for a penal offence. The answers to these special interrogatories are evidence in the cause at the hearing, for both parties." Benedict, Admiralty, 1st Ed., 1850, § 519. It is obvious enough that special interrogatories must be granted upon order of the court. "In suits for mariners' wages the libellant may compel the adverse party to answer special interrogatories, which are filed under the direction of the court, * * *. And in point of convenience this practice should be adhered to, for it brings distinctly before the court the points, on which the defence is intended to be rested." Gammell v. Skinner, 9 Fed.Cas. page 1142, No. 5,210, 2 Gall. 45.

65. It will be noted from the material included in Note 62 that the purpose of

In its present form, discovery is certainly not excluded. Although the language has undergone change, it is said the current rule carries on the sense of its predecessors.

If the modern regulations of the District Courts be examined, it will be discovered most of these contain a rule which specifically permits discovery from a party, although the means of proceeding are not specified but left to the practice.

"Discovery, inspection and taking of a photograph of any article, property or place under the control of a party may be had by any other party, upon order of the court." [66]

But we are not without other guidance in this particular field. A case [67] was filed in the Southern District of New York. Immediately after libel was filed, interrogatories were proposed by one claimant to the claimant of another vessel involved.

Specific objection was taken upon the ground that the right to file interrogatories does not exist except where there are pleadings creating issues between the parties. Judge Woolsey, who then adorned the District Court, wrote an able and scholarly opinion upon the subject. Therein the jurist reaffirmed the power of instance courts to mold the practice to the situation. He further laid down the principle, in the absence of rule, statute or order, that discovery from a principal party before trial was an essential of admiralty practice. He said:

"Either of the claimants * * * under the present practice of this court, may, with leave of court, put interrogatories to the other party independent of its pleading.

"The utmost freedom of discovery before trial, compatible with allowing to a

---

all of these investigations was to appeal to the conscience of the opposite party and to discover facts which would do away with the necessity of proof. The Supreme Court of the United States adopted two rules, which are printed in 44 U.S. IX, as follows: "Rule XXIII. * * * And the libellant may further require the defendant to answer on oath all interrogatories propounded by him touching all and singular the allegations in the libel at the close or conclusion thereof." "Rule XXXII. The defendant shall have a right to require the personal answer of the libellant upon oath or solemn affirmation to any interrogatories which he may, at the close of his answer, propound to the libellant touching any matters charged in the libel, or touching any matter of defense set up in the answer, * * *. In default of due answer by the libellant to such interrogatories the court may adjudge the libellant to be in default and dismiss the libel, * * *." The language of the Rule makes the answer to interrogatories attached to the pleadings mandatory. However, it does not preclude an order of the court directing a party to answer special interrogatories on dedimus potestatem or commission.

Although the language is different, the present Rule 31 amalgamates both the rules set out above, and continues them in effect. "While the new rules do not expressly provide that either party may

require disclosure of matters touching the case or defense of the opposite party, yet there is nothing in the new rules to show that it was intended to deny such right provided by the old rules, but rather that the court was given a wider discretion in requiring disclosures on such points. New rule 32 seems to sanction this view. The Admiralty Rules in this particular differ from equity rule 58. * * * The reason for the broader right in this respect given by the Admiralty Rules may, in part, rest upon the fact that the testimony of those witnesses upon the ship having knowledge of the transaction may be lost to either side by reason of the nature of the employment and the roving manner of life of the ship's crew * * *." The Henry S. Grove, D. C., 287 F. 247, 249–50.

66. The following districts have adopted the above Rule: Eastern District of New York, Rule 25; Northern District of New York, Rule 25; Southern District of New York, Rule 25; Western District of New York, Rule 31; Eastern District of Texas, Rule 22; Southern District of Texas, Rule 22; District of Canal Zone, Rule 26; Third Division of Alaska, Rule 25; The Admiralty Rules of the Southern District of New York have been adopted in the District of Connecticut.

67. The Cleona, D.C., 37 F.2d 599, 601.

party certain necessary reticences in respect of his oral evidence, is of the essence in any enlightened procedure."

It is true he spoke of essential safeguards of reticences of the party. But the right to search the field is affirmed. We take it that the Court of Appeals of the Second Circuit still follows the principle with the same reservations. Cf. Cleary Brothers v. Christie Scow Corporation, 2 Cir., 176 F.2d 370. If this be law, can it be doubted that the Admiralty Court, which has the power to permit the search of the conscience of a party by interrogatory as of course before the pleadings are made up, cannot by order require a party to undergo oral examination? It could hardly be contended that interrogatories could not be used for discovery in view of this history. A like contention as to depositions is unsound.

Pursuant to the historic practice outlined above, and pursuant to the power granted by the statutes and the Supreme Court Rules, at least three important admiralty courts, those of California, Southern District, of Ohio, Northern District, and New York, Western District, have each adopted a local rule [68] which confirms the use of oral deposition for discovery from a party as well as written interrogatories. The text of this rule is in each instance: "After joinder of issue, and before trial, any party, by leave of the court granted on notice, may examine orally the opposite party, his agents or representatives, or deliver interrogatories in writing, for the examination of such party, his agents or representatives, with regard to any fact material to the issue."

This text incorporated the very words themselves of the rule which was in force in the Southern District of New York in 1920 and for many years prior thereto. The existence of this express crystalization of customary usage indicates that the admiralty bar of the district in which most causes were tried in comparatively recent times acquiesced in the interpretation which is here put forth.

It is interesting to note that the admiralty practice in regard to oral depositions for discovery had a quite modern reverberation. The opinion of Judge Ward, of the Southern District of New York, based upon the rule then in existence there, held that, since the libelant would not be bound by the testimony of the master and lookout, no longer employed by the claimant, these persons were not within the rule which was, in the court's opinion, "no doubt, adapted in analogy to the principles of discovery in chancery, and must be understood to apply to parties only." The court points out that no harm was done because the deposition of this master could be taken under the parallel procedure of deposition de bene esse. U.S.Rev.Stat. § 863, 28 U.S.C.A. § 869 [see note preceding revised 28 U.S.C.A. § 1781]. The alternative position of the "examination" and the "interrogatories" supports the older authorities. The opinion is a complete refutation of every argument here urged, if oral discovery is sought from a party.[69]

---

68. Southern District of California Admiralty Rule 121, adopted April 1, 1925, as in effect May 1, 1940. This Rule does not appear in the Rules effective January 15, 1944; (Among these later rules, Rule 134 provides, "Examination and discovery before trial shall be in accordance with Supreme Court Admiralty Rules 31 to 32c inclusive."); Northern District of Ohio Admiralty Rule 38, adopted December 15, 1928, as in effect May, 1940; Western District of New York Admiralty Rule 29, adopted October 20, 1938, as in effect November 1, 1938.

The Rule, as adopted in the Southern District of New York and construed in The Sisilina, D.C., 212 F. 1022, appears as XXXVIII probably first in 1912, Bender's Lawyers Diary and Directory (1915), p. 468, and remained in force for some years. See Bender's Lawyers Diary and Directory (1920), p. 195.

69. The Sisilina, D.C., 1914, 212 F. 1022, 1023. "The libelant in a cause of collision applies for an order under District Court rule 38 in admiralty, giving her leave to examine the master and lookout of the respondent's vessel. * * * The witnesses in question are not now in the employment of the respondent, and, if they were, are, in my opinion, not within the rule. * * * The purpose cannot have been to authorize one par-

The conclusions which are to be drawn from this resume of the practices of the Admiralty Courts is that discovery from a party before trial was always a permissible practice, but that there was a shift of emphasis wherein the personal response of the party to the positions of the libel or answer fell into disuse and the practice of searching the conscience by written interrogatories had vogue for a time. But there was always opportunity at the court's discretion to take testimony by word of mouth. After the Judiciary Act in Admiralty, viva voce testimony became the rule in court, and this custom, although severely criticized, extended to depositions de bene esse. The modern tendency would seem to indicate any such distinction is unrealistic and evanescent.[70]

ty to examine the officers and crew of the other party's vessel, and so discover his entire case, without being bound by the testimony. There is no hardship whatever upon the libelant, because under section 863, U.S.Rev.Stat. (U.S. Comp.St.1901, p. 661), she can examine the master, who lives more than 100 miles from the place of trial, and probably can examine the lookout under the same section, when his whereabouts are discovered."

70. The history of oral testimony in admiralty proceedings in this country indicates there is no possible bar to its use on order of court. It must be remembered that, even in the time when paper proofs were used, the officials thoroughly inquired of the deponent concerning each written question, and in fact cross-examined him before recording the answers, to be sure that they had his meaning exactly. This implication is found in General Order 97 of 1867 of Ireland, which reads: "In case of an examination before an Examiner or Commissioner of the Court, the Examiner or Commissioner may put any questions to the witnesses for the purpose of eliciting the truth as to him shall seem fit." Boyd, The Law and Practice of the High Court of Admiralty of Ireland, 1868. The early statute of the United States, September 24, 1789, (1 Stat. 88,) required: "That the mode of proof by oral testimony and examination of witnesses in open court shall be the same in all the courts of the United States, as well in the trial of causes in equity and of admiralty and maritime jurisdiction, as of actions at common law." The ancient practice became optional in equity again after 1802. Sec. 25, Act April 29, 1802, 2 Stat. 166. But the requirement of testimony ore tenus remained obligatory in admiralty instance courts. Besides, the Supreme Court permitted viva voce testimony to be given in a suit brought up by writ of error before the Justices thereof. The Brig Union, 4 Cranch 216, 8 U.S. 216, 2 L.Ed. 600. When the statutory power was given to the Supreme Court to regulate admiralty procedure in the lower courts, no express rule was adopted on this subject. Apparently, upon the assumption that the statute, 1 Stat. 88, was still controlling, as, of course, it was. Soon thereafter, that court adopted a rule, in 1851, as to testimony upon appeal, which, while it recognized the power of the lower court to control their own practice by reference, adopted the requirement of oral testimony. This rule required proof by deposition on appeal to be taken "upon an oral examination and cross-examination" unless otherwise ordered by the lower court and prescribed that, when oral testimony was taken down from the District Court under the statute, 1 Stat. 88, above quoted, it should be transmitted to the appellate court, 54 U.S. unnumbered page (13 How.). This rule, which so adopted the statutory direction, was continued in effect until superseded by the present Rule 46. Notwithstanding the repeal of the basic statute, 1 Stat. 88, by the adoption of R.S. § 862 in 1874, the above resume indicates the Supreme Court considered testimony ore tenus to be the rule in all admiralty proceedings unless the District Judge ordered otherwise. All doubt, however, was removed by the adoption of the modern Rule 46 in 1921, 254 U.S.App., p. 20, which expressly directs, "In all trials in admiralty the testimony of witnesses shall be taken orally in open court, except as otherwise provided by statute, or agreement of parties." It is not expressly required that testimony on deposition or commission be taken orally, but the method is certainly given express sanction in view of the present tendency. So well described by Miller, "The Mechanism of Fact-Discovery: A Study in Comparative Civil Procedure," 32 Ill. L.Rev. 261–455, where it is said: "Thus, whatever else the present survey reveals, it discloses that the viva voce examination, as an instrument of fact-discovery, is in general extruding the written

method even in its later forms. It affords interesting corroboration of the view generally held by those qualified to speak that for most purposes the former is by far the superior method. And, as we may perhaps warrantably add, it foreshadows a time when that same viva voce examination will everywhere be the commanding figure in the present field."

The actual American practice as to oral examination before trial is somewhat difficult to fix, as practice always is. Judge Learned Hand, a great jurist of the liberal tradition, was constrained to deny discovery by ordinary process in equity, but a bill of discovery was available on proper conditions, which precluded more summary procedure. Pressed Steel Car Co. v. Union Pac. R. Co., D.C., 241 F. 964. A report of a colonial case furnished an interesting background: "Ffrances Harison Qui Tam Contra Pinke Good Intent and European Goods. Evidence may be taken viva voce on special motion. Dec. 3, 1716, Upon a Lybell exhibitted for haveing Brandy and European Goods on board for which noe Crockett or reporting the same as the Laws direct; Mr. Jamieson, deputy advocate, prays Robert Campbell may be sworn to be examined viva voce ex parte Informr, who was sworn. Mr. Bickley, proctor for the defendt prays Mr. Samuel Bayard may be sworn and examined viva voce, who was sworn accordingly." Reports of Cases In the Vice Admiralty of the Province of New York, Ed. by Charles Merrill Hough, Yale U.P., New Haven, 1925. This report gives ground for the comment that the Admiralty Courts of the United States have tended to follow the precedents of the colonial courts rather than the strictly English practice. It further shows that the colonial courts were not always advised as to what the traditional practice was. "In 1700 it had been suggested to the Board of Trade that some could and judicious attorney, well practiced in the methods of Doctors' Commons, that might advise in the proceedings of the Admiralty Court, might be sent to the Colonies and to Pennsylvania in particular 'since the gentlemen concern'd freely acknowledge their unacquaintance in' the Civil Law, and with the practice of that Court." Calendar State Papers Colonial, 1700, p. 724. Records of the Rhode Island Vice-Admiralty Court, 1716–1752, p. 91. An early case (1828) in equity furnishes the rationale of the procedure of examination and supplies a common sense view well adapted to the "modern" approach. "When he is examined before a master in relation to his own rights in the cause, the examination is in the nature of a bill of discovery. * * * The ancient practice was to file written interrogatories for the examination of a party, to which he put his answer in writing. The modern practice of examining orally before a master does not alter the rights of either party." Benson v. LeRoy, 1828, 2 Paige 122. But an order was apparently required. Justice Story indicates that an order should be required but the practice was otherwise. "Indeed, in strictness, the testimony of persons, whether salvors or others, who are parties to the suit, ought not to be taken, except under a *special order* of the court for this purpose, showing a cause, as is done in the ordinary course of chancery proceedings. In the looseness of our practice it is often done without such an order. But it is irregular; and it would be well, that the irregularity were corrected, as the court might in its order limit the inquiries to matters properly within the scope of the exception." The Schooner Boston, 3 Fed.Cas. pages 932, 938, No. 1,673, 1 Sumn 328, 345. In Betts' Admiralty Practice (1838), p. 84, it is stated, as to depositions de bene esse, that "the examination is in public and the questions are put orally as on trial." Attention is called by the author to the fact that the earlier practice was to examine by interrogatories, and thereupon criticism of viva voce testimony on deposition is voiced as follows: "If the modern practice is better calculated to search into and extract the full knowledge of a witness, it is also liable to abuses * * *." Conkling says: "Witnesses whose depositions are taken in this form, are examined and cross-examined viva voce, as in open court." Conkling, Admiralty, Vol. II, p. 292. In the same volume (pp. 283-4), the author indicates that the taking of testimony by interrogatory would have been the practice in American Admiralty Courts if the process Act of 1792 had stood with only the adoption of the civil law, but oral proof was therein expressly required. Benedict, Adm., 1st Ed., § 519, indicates that viva voce proof on trial is the established method. Dunlap, Admiralty Practice, 2nd Ed., p. 223, says: "The testimony of witnesses in the District and Circuit Courts of the United States, in civil causes of Admiralty jurisdiction, is frequently given *viva voce*, as it is in the British Courts of Admiralty in causes heard *summarissime*, such as cases of seamen's wages." "Oral

But if the court can issue an order for the examination of a party as to any material fact upon interrogatories, there would seem to be no doubt of the power to issue an order for examination in open court, orally or in a pretrial conference, for the purpose of obtaining admission, or before a designated person.[71] If the party fears matters of private concern are to be invaded or privacy destroyed, he may appeal to the court for a limitation by the original order or may follow the procedure of objecting to the particular question and refusing to answer it until the ruling of the judge be obtained thereon. Through the whole course of history, admiralty judges have required special circumstances for discovery and have imposed severe limitations upon its scope and content.[72] The protection of essential reticences of a party

Depositions. Depositions of witnesses shall be taken by oral interrogatories and cross-interrogatories propounded by the respective parties of record or their proctors, which interrogatories and cross-interrogatories and the answers thereto and all other proceedings, shall be taken in shorthand by a competent and disinterested stenographer, reduced to typewritting, and shall be read by or to the witnesses and signed by them respectively; but any of these requirements may be waived by agreement of all parties present or represented at the taking of the deposition or depositions. Eastern District of Pennsylvania, Rule 2, Part 5(3).

71. It would seem that the order of this Court in this case might have been based upon Rule 16 of the Eastern District of Pennsylvania, if the Court were of opinion it was necessary that libelant submit to an oral examination for discovery purposes in order to prevent failure or delay of justice. The text of the Rule reads: "Rule 16. Open Commissions. The court, in any case where it is necessary in order to prevent failure or delay of justice, may order the issuance of an open commission to take depositions, which commission shall be moved for (if not consented to) upon affidavits specifying the facts to be proven, together with the names of the witnesses, the place or places where the testimony is to be taken, and the shortest time in which the parties believe the testimony may be taken, and the commission returned; and the witness may be examined under such commission on oral interrogatories propounded by the respective parties or their proctors, which interrogatories together with the answers thereto and all other proceedings, shall be reduced to writing in the presence of the commissioner, or to be taken by a stenographer in the presence of the commissioner and afterwards written out by said stenographer, and after the proceedings shall have been reduced to writing, or shall have been written out by the stenographer aforesaid, the same shall be read to, or read by, the respective witnesses and shall respectively be signed by them unless the parties otherwise agree; and the same, so taken and subscribed, together with the commission, shall be signed by the commissioner, sealed and transmitted by him to the clerk of the court, as soon as the same shall have been executed. In granting any such open commission the court may impose such terms as in its discretion it deems proper."

72. These limitations are sometimes stated in terms of lack of power. "The respondent * * * is seeking discovery, not for the purpose of enabling it to answer, * * * but because it does not wish to answer. It says that the answer might tend to incriminate it, and, if it had discovery, such discovery might indicate that it had no interest in the controversy and is not a proper party. * * * I see no power under local admiralty rule 39 to grant discovery before answer. Interrogatories attached to the pleadings furnish the usual, if not the exclusive, remedy in admiralty, and, as I held in a memorandum dated March 16, 1915, in the case of Webb v. Samuels et al., D.C., 227 F. 948, a defendant in a civil suit must take his choice between answering or letting the proceeding go against him by default, and cannot, in my opinion, urge that he should be relieved from answering because his answer may incriminate him." New York & Bermudez Co. v. Mowinckel, D.C.S.D. N.Y., 227 F. 950. "This application is made for what is asserted to be the discovery of certain original cablegrams sent from France, and of certain messages and a letter sent from the United States to the owner of the yacht Eros, whose agent in this country has intervened as claimant. The application is based upon an alleged power of the court of admiralty, proceeding either under its own or the general admiralty rules, or, in the absence of any particular rule, applying the equity rules of the

or of his privacy has always been maintained.

██ Presently, as has been insistently pointed out, no such problem as to scope of examination is presented. The libelant did not object to giving testimony at all because discovery was sought. The only question is whether a party is bound to submit to oral examination before trial upon any feature when ordered to do so by the court. Even without this elaborate review, the answer is plain.

██ It is not intended by this discussion to say or even to intimate that such an order should be adopted in any particular case[73] or that discovery should ever be allowed. The matter should be left to the determination of the admiralty judge.

██ The District Court in this case was acting strictly in accordance with the authority thus granted in passing the order requiring the party to make answer on oath and undergo examination concerning the matters involved in the cause. The same thing could be accomplished by rule applicable in all such causes. The history and expressions of the writers show that this is no novel procedure, but is sanctioned by time and authority. Therefore, the order did not violate the due process clause.

██ There was then no excuse for the failure of the libelant to give any testimony whatever,[74] notwithstanding the direction of the Court. So long as the attempt was in good faith to develop the issues, the procedure is in common usage as a part of conferences pretrial in many courts. If discovery were pressed, the witness could have refused to answer, and an authoritative ruling could have been obtained from the Trial Court. But recalcitrant and contemptuous violation of the Court's order was not proper. The risk of dismissal was thereby courted.[75] Whether

United States. * * * It may be assumed that, under circumstances making such action proper, the court might grant the relief of a motion for discovery, in any case where the filing of a suit in equity, brought upon a bill for such discovery, would be unnecessary. But the present motion presents no such situation. The libelant has in his possession, or can obtain from the cable company * * * the originals of such messages as were sent by him. He also has the replies received, and in the case of the letter a notice to produce, or a subpoena duces tecum, would enable the libelant to offer on the trial his copy of the letter sent, and, under the circumstances shown, any denial of receipt would be a matter of defense for the claimant." The Eros, D.C.E.D.N.Y., 224 F. 194. And see the cases cited in Note 44.

73. "The rules of practice in admiralty, while flexible and liberal, require orderly procedure and fairness in the conduct of a cause." The Guy C. Goss, D.C., 53 F. 826, 828. "While ample powers are given to courts of admiralty and maritime jurisdiction as to forms and modes of procedure, it is a power 'held in trust for the benefit of litigants,' and to be applied to the practical needs of justice. The Alert, D.C., 40 F. 838; The Hudson, D.C., 15 F. 175; Deslions v. La Compagnie, etc., 210 U.S. 95, 28 S. Ct. 664, 52 L.Ed. 973. This power, how-

ever, must not be arbitrarily applied, but must have relation to rules of evidence, or promulgated rules of court, or statutes duly enacted." The Princess Sophia, D.C., 269 F. 651, 655.

74. The giving of the testimony and the admissibility are different questions. No rights are waived by giving or taking a deposition. "It is urged by libelant that by reason of the claimant of the ship taking depositions prior to excepting the right to object to this proceeding in rem was waived. * * * Surely, then, the taking of testimony by this owner, which may never be offered, and by reason of which libelant has not acted to her harm, cannot prevent claimant from calling the court's attention to an omission in the law which is fatal to libelant's rights, whatever may be the testimony. If taken prematurely (as to which no opinion is expressed), the depositions might be refused admissions; but preparation for their possible use cannot supply substantive law essential to jurisdiction, or prevent claimant's pointing out defects in the law." The Samnanger, D.C., 298 F. 620, 623.

75. In view of the liberality of procedure in admiralty courts, there has always been a tendency to act without the order of court, even where an order was an essential, because consent cured all defects. This tendency is noted in The Schooner Boston (quoted in Note 68).

the present attempt was to get a ruling of this Court on a minor point of technical procedure, with which we should not deal,[76] we can but guess. In any event, we disapprove of such a practice of allowing a case to be dismissed and the interests of a client jeopardized upon technical minutia which should be in the discretion of the Trial Court. Such practice leads in fact, although not in theory, to multiple appeals.

We are not sure the order in this case is a dismissal but have treated it as if it were, because the parties have done so. In any event, the cause must be remanded. While no doubt is entertained as to the power of the Court,[77] on its own account,

In Dunlap, Admiralty Practice, 2nd Ed., p. 126, it is said that interrogatories to either party may be propounded to search the conscience, and that, upon refusal or neglect to answer, "a party is deemed to be in contumacy and default. If the party be plaintiff, the suit will be dismissed; if defendant, the claim or answer will be treated as a nullity and default entered." See also Jay v. Almy, 13 Fed.Cas. page 387, No. 7,236, 1 Woodb. & M. 262, 267. Where there was a suggestion that an order for discovery might not be obeyed, the response has been swift and decisive. "It would seem that the application may be made by affidavit, or that the taking of testimony can be compelled, if the production of witnesses is considered necessary; but in so far as the present application depends upon the power of the court to compel the libelant to obey the order of this court, for the production of such books and papers, it would seem that such a production could be ordered, and even upon affidavits, if they be deemed sufficient therefor; * * *." The Washtenaw, D.C., 163 F. 372, 375. Even to the extent of decree pro confesso for refusal to obey. Wittenberg Coal Co. v. Compagnie Havraise Peninsulaire De Navigation À Vapeur, 2 Cir., 22 F.2d 904.

76. The Supreme Court of the United States early indicated a disinclination to deal with procedural points in admiralty, provided there was no abuse of due process. "The last point made in argument was, whether the process of attachment could issue without an order of the judge. But here, again, we have to remark, that we can take no notice of the circumstances under which the writ actually did issue. And looking to the libel, it appears to have been its express object to obtain such an order from the court. That the process of attachment at the civil law did not issue of course, is very well known. It was obtained for contumacy, after monition; and analogy, as well as public convenience, would seem to render the judge's order necessary. Yet, we see no objection to

pursuing the prayer of the libel, and issuing it simultaneously with the monition; the purpose of justice would seem to require that course." Manro v. Almeida, 10 Wheat. 473, 23 U.S. 473, 494, 6 L.Ed. 369. Where a procedural question is raised in an admiralty case upon appeal, Judge Learned Hand, after discussing the matter at length, indicates the proper attitude of an appellate court. "We cannot close our eyes to the situation as it exists, or deny that it may be an occasion for action out of the common. Obviously we cannot now say what circumstances might induce us to interpose. The matter is primarily one for the District Judges; and we must assume that they feel themselves as much bound by the law as we. All we need now decide is that on the showing before us it does not appear that the order was improper. As the appellant does not dispute the propriety of the decision upon the merits, but merely wishes to raise the point of jurisdiction, we affirm the decree without more." The P.R.R. No. 35, The Eugenia Moran, 2 Cir., 48 F.2d 122, 124-125.

77. The question of due process is a delicate one. "The difference between mere punishment, as illustrated in Hovey v. Elliott [167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215], and the power exerted in this, is as follows: In the former, due process of law was denied by the refusal to hear. In this, the preservation of due process was secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense." Hammond Packing Co. v. State of Arkansas, 212 U.S. 322, 351, 29 S.Ct. 370, 380, 53 L.Ed. 530, 15 Ann. Cas. 645. The following case is of interest in showing methods of dealing with defaults by reason of failure to respond: "A period of one year and four months elapsed between the time the questions were asked and the interlocutory decree. The refusal to answer the interrogatories is more than a contempt. It was a failure of the appellant

to dismiss a cause at any time upon failure of a party to obey routine orders, to the prejudice of speedy and proper administration of justice, it appears no notice was given to libelant of the intention of the Court to proceed to such lengths. Of course, if libelant had failed to appear in Court for pretrial conference or trial, the cause might have been dismissed summarily. But here the refusal to testify was a matter which occurred outside of court. Therefore, there should have been no dismissal without special notice of the intention. On remand, any claimed error in the lower Court should be raised upon appeal from the merits after trial.

Reversed and remanded with the directions to proceed in accordance with this opinion.

to give information which the appellee was entitled to under the rules in admiralty. For such refusal, remedy is afforded by rule 31 of the Admiralty Rules, * * *. Exercising the power given to the District Court under this rule, it was well within its right in promoting justice to order a decree pro confesso." Wittenberg Coal Co. v. Compagnie Havraise Peninsulaire De Navigation Á. Vapeur, 2 Cir., 22 F.2d 904–905. The case which follows seems unsound, but is noted to emphasize the case which must be used in dealing with the failure to give testimony. "Rule 32 [Sup.Ct.] provides that the libel may be dismissed if the libelant fails to answer interrogatories; but the dismissal is not upon the merits, and the libelant may sue again. But here is a judgment on the merits against the respondents and forecloses forever the respondents' opportunity to be heard. The failure to answer the interrogatories, if propounded under an order of the court, may be penalized by excluding testimony upon the subject-matters of the inquiries or by punishing for contempt; but, where an answer stands to the libel, there can only be a decree after the case is reached in its regular order upon the calendar and libelant's right to succeed shown by evidence before a judge of the court. I think the respondents are right in their contention, and, even though there have been flagrant defaults by them, I am obliged to vacate this decree, for the reason that it is entered in violation of the respondents' constitutional rights." The Fred E. Richards, D.C.S.D.N.Y., 248

F. 956, 959. Other methods might have been adopted. In Sandgate Castle (1939), A.M.C. 827, the court granted an order that certain specified interrogatories shall be considered conclusively as answered in the affirmative and others in the negative if full compliance be not made by petitioner to the interrogatories as to which exceptions have been sustained to the answers already given. "Where a party has obtained an order, on default, directing exact answers to certain interrogatories, and the answers are plainly not exact, the Court will, on motion, preclude the answers unless the answering party succeeds in having the default opened or in having the original judge modify his order." 1931 A.M.C. 927, W.T.C. No. 33. Judge Learned Hand refused to strike out an answer for failure to answer certain interrogatories in Barnes v. Trees, D.C., 194 F. 230.

In this case, we are not sure that the method adopted by the learned Trial Judge was strictly in accordance with Admiralty Rule 32C, under which the Court purported to act, Brown v. Isthmian Steamship Company, D.C., 79 F. Supp. 701, since here the party did not fail to appear and did not refuse to respond to any particular question. However, if the proper procedural steps had been taken, it is probable that the Court had the right to dismiss the action for failure to obey the order. And see in this connection Producers Releasing Corporation De Cuba v. P. R. C., 2 Cir., 176 F.2d 93, 95.